927 F.2d 1028
 21 Envtl. L. Rep. 20,994
 James LOCKHART, Gemma Lockhart, Appellant,
Sandra Reub, American Indians Against Desecration,
v.
Darral KENOPS, Forest Supervisor, Black Hills National
Forest, United Forest Service; Gary Cargill, Regional
Forest Service; F. Dale Robertson, United States Forest
Service; John Block, Secretary of Agriculture; Verla Van
Etten, Appellees.
 No. 89-5575SD.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 10, 1990.
Decided March 7, 1991.
 
 Larry Leventhal, Minneapolis, Minn., and Bruce Ellison, Rapid City, S.D., for appellant.
 Robert L. Klarquist, Washington, D.C., for appellees.
 Before WOLLMAN and MAGILL, Circuit Judges, and HEANEY, Senior Circuit Judge.
 MAGILL, Circuit Judge.
 
 
 1
 Gemma Lockhart appeals from an order of the district court[1] granting summary judgment to the government in her action to enjoin the exchange of a parcel of federal land. On appeal, Lockhart argues that the Forest Service's decision to go ahead with the exchange without preparing an environmental impact statement (EIS) was arbitrary and capricious and violated the National Environmental Policy Act (NEPA). Lockhart also argues that the decision to proceed with the exchange violated the first amendment of the Constitution and the American Indian Religious Freedom Act (AIRFA) because the exchange will interfere with the exercise of Lockhart's religion and because Indian religious leaders were not consulted. Because we find that the Forest Service's decision was not arbitrary and capricious and did not violate NEPA, AIRFA or the first amendment, we affirm.
 
 I. BACKGROUND
 A. The Administrative Process
 
 2
 This action concerns a land exchange between the federal government and Verla Van Etten, the intervenor below. Proceedings have been going on for nearly nine years. On September 22, 1982, Van Etten proposed exchanging 160 acres of land she owned in the Black Hills of South Dakota for 100 acres owned by the Forest Service in another part of the Black Hills. It is this second parcel, located along the edge of Dark Canyon in a rural area near Rapid City, that the parties are arguing about. The purpose of the exchange, from the Forest Service's point of view, was to consolidate federal lands; the Dark Canyon parcel was surrounded on all sides by private land, whereas the land offered by Van Etten was surrounded on all sides by land that already belonged to the Forest Service. The Van Etten parcel was also particularly desirable to the Forest Service because it is important wildlife habitat. Van Etten wanted to develop the Dark Canyon parcel; she planned to build sixteen luxury homes on it. On October 6, 1983, the Regional Forester issued an environmental assessment (EA) as required by Sec. 254.10 of the Forest Service regulations governing land exchanges, 36 C.F.R. Sec. 254.10(b), to ensure compliance with the National Environmental Policy Act (NEPA), 42 U.S.C. Secs. 4331-4347. NEPA requires that an environmental impact statement (EIS) be done for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. Sec. 4332(2)(C) (1988). An agency prepares an EA to determine whether an EIS is required under this standard. The EA concluded that the exchange would have no significant impact on the environment and that therefore no EIS was required. However, the EA stated that approval of the exchange was "in concept only"; final approval was expressly conditioned on completion of studies of cultural and mineral resources with a finding that they would not be significantly affected.
 
 
 3
 When appraisals showed that Van Etten's land was worth less than the federal land, Van Etten offered an additional eighty-acre parcel in the same area to equalize the land values. On January 3, 1985, the Regional Forester approved the revised exchange proposal and issued a revised EA, again concluding that the exchange would have no significant impact on the environment and that no EIS need be done. During the next month, February, Lockhart and five other Dark Canyon landowners appealed the decision to the Forest Service pursuant to 36 C.F.R. Sec. 211.18. They complained that developing the land would adversely affect the air, water, and soil, would harm wildlife, including endangered and threatened species, and would interfere with Indian religious ceremonies. On June 7, 1985, the Chief of the Forest Service, Max Peterson, remanded the matter to the Regional Forester, saying that the Regional Forester's approval of the project was "procedurally deficient" because: (1) the proposed exchange of the second parcel of eighty acres had never been publicly advertised, as required by 36 C.F.R. Sec. 254.8; (2) the earlier approval had been contingent on studies of cultural and mineral resources that were never done; and (3) the revised EA did not discuss the environmental impact of Van Etten's planned use of the land. Chief Peterson also said that the EA ought to discuss the applicable state and county regulations and how they would affect the intended use of the property. On July 9, 1985, the Regional Forester issued a supplemental EA that included the missing studies and other supporting documentation, including the applicable zoning regulations.
 
 
 4
 In August 1985, Lockhart and two of the other original administrative appellants appealed again. On September 2, 1986, Chief Peterson again sent the case back to the Regional Forester for supplementation of the administrative record under 36 C.F.R. Sec. 211.18(q).[2] The Chief said that because Van Etten's plans for developing the land had become more definite, the record should be supplemented to consider information about the environmental effect of those plans. In his letter ordering the remand, Chief Peterson said, "[W]e are concerned that the potential environmental consequences ... are not sufficiently discussed" in the EA, and he ordered the Regional Forester "to specifically address the direct effects of Van Etten's proposal on the soil, water, and air quality on and in the vicinity of the parcel, as well as its indirect effects on highway traffic, esthetics, and forest fire problems."
 
 
 5
 On November 4, 1986, the Regional Forester issued an environmental assessment update (EA update or final EA) with a geological study of the land attached. The EA update addressed the issues the Chief had specified, albeit not in great detail. On May 7, 1987, Dale Robertson, the new Chief of the Forestry Service, approved the exchange. When the Secretary of Agriculture declined to review that determination, the decision became final under 36 C.F.R. Sec. 211.18(f)(6). The exchange could not take place, however, because Public Land Order 725 (PLO 725), issued June 4, 1951, had classified the land for public uses and made it illegal for the government to transfer it. An injunction issued in National Wildlife Fed'n v. Burford, 835 F.2d 305 (D.C.Cir.1987), prohibited the government from changing the classification. Therefore, the case was in procedural limbo for some time after the Chief's decision.
 
 B. Court Proceedings
 
 6
 On August 4, 1987, Lockhart and two other Dark Canyon landowners who had appealed at the administrative level filed this action, alleging violations of NEPA, the Endangered Species Act (ESA), 16 U.S.C. Secs. 1531-1544, the Bald Eagle Protection Act, 16 U.S.C. Sec. 668, Sec. 106 of the National Historic Preservation Act, 16 U.S.C. Sec. 470f, the American Indian Religious Freedom Act (AIRFA), 42 U.S.C. Sec. 1996, the Federal Land Exchange Acts, 16 U.S.C. Secs. 485, 486, 516, 521d, 555a; 42 U.S.C. Secs. 1715, 1716; 7 U.S.C. Sec. 1011, and the first and fifth amendments to the federal Constitution. The action sought declaratory and injunctive relief to prevent the Forest Service from proceeding with the exchange unless and until the cited statutes were complied with. The parties stipulated to a stay, however, because of PLO 725 and the injunction in Burford. Then, on November 4, 1988, the D.C. Circuit vacated the Burford injunction, and six months later PLO 725 was revoked with respect to the land in this suit. 54 Fed.Reg. 17,708 (1989) (codified at 43 C.F.R. PLO 6728). The revocation of PLO 725 became effective May 25, 1989; shortly thereafter, the government announced that it intended to go ahead with the exchange. On July 5, 1989, the district court granted a temporary restraining order (TRO) prohibiting the exchange, subject to posting of a $50,000 bond by plaintiffs. When the plaintiffs did not post the bond, the court lifted the TRO and allowed the exchange, subject to the requirement that Van Etten not cause "any physical change or destruction of the environment or property" until the case was over. The exchange occurred on July 7, 1989.[3] The district court granted the government's motion for summary judgment on September 18, 1989, holding that the agency's decision not to prepare an EIS was not arbitrary and capricious. Lockhart filed a notice of appeal on November 17, 1989. On appeal, she claims violations only of NEPA, AIRFA, and the first amendment. The other two federal plaintiffs did not appeal.
 
 II. DISCUSSION
 
 7
 We review the district court's decision de novo. "[T]he appellate court must render an independent decision on the basis of the same administrative record as that before the district court; the identical standard of review is employed at both levels; and once appealed, the district court decision is accorded no particular deference." Brown v. United States Dep't of Interior, 679 F.2d 747, 748-49 (8th Cir.1982) (quotation omitted). Under Sec. 706(2)(A) of the Administrative Procedure Act, an informal determination by an agency must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A) (1988). An agency's decision not to prepare an EIS is reviewed under this standard. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); Goos v. I.C.C., 911 F.2d 1283, 1291-92 (8th Cir.1990).[4]A. NEPA
 
 
 8
 NEPA requires that an EIS be done for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. Sec. 4332(2)(C). "Affecting" is defined as "will or may have an effect on." 40 C.F.R. Sec. 1508.3. To determine whether the proposed action "significantly" affects the environment requires consideration of a variety of factors under 40 C.F.R. Sec. 1508.27.
 
 
 9
 When the federal government exchanges land, it must consider the environmental impact not only of the exchange itself, but also of the proposed use of the federal land once it passes into private hands. National Forest Preservation Group v. Butz, 485 F.2d 408, 411-12 (9th Cir.1973). Therefore, the Forest Service was required to consider the effects of Van Etten's planned development in determining whether the exchange would significantly affect the human environment.
 
 
 10
 Lockhart claims that the Forest Service's decision was arbitrary and capricious because the Service did not properly consider the factors enumerated in Sec. 1508.27. She argues that the project significantly affects the environment and that therefore an EIS is required. While we agree that the agency's consideration of some points was not as careful as it could have been, we cannot say that the Forest Service's consideration of environmental factors was so deficient as to make its decision arbitrary and capricious. We now address Lockhart's specific contentions.
 
 1. Water Quality
 
 11
 Lockhart contends that effluent from the sewage systems of the houses to be constructed could seep through the ground and through rock fissures into the aquifer that supplies water to her and her neighbors, or could seep onto the walls of Dark Canyon. From the canyon it would drip down into Rapid Creek, directly below, which is the water supply for Rapid City. The study submitted with the final EA of November 1986 discusses possible problems with sewage disposal and acknowledges that sewage could surface on the canyon walls. The study makes recommendations for proper placement of septic tanks and leach fields that would avoid the problem--but then goes on to say that such placement may not be possible on four of the sixteen lots. However, the study also points out that the applicable zoning regulations[5] contain stringent requirements for safe sewage disposal, and thus concludes that there would be no significant impact on the environment. After reviewing the zoning regulations, which require that sewer systems comply with detailed design and specification requirements and be approved by the city engineer, we find that the Forest Service's conclusion that the zoning regulations will prevent any significant impact on the environment was not arbitrary and capricious. See Maryland-National Capital Park & Planning Comm'n v. United States Postal Serv., 487 F.2d 1029, 1036-37 (D.C.Cir.1973) (compliance with zoning laws tends to show that impact of the land use is not "significant" ); Sierra Club v. Cavanaugh, 447 F.Supp. 427, 432 (D.S.D.1978) (same; "the Federal agency is to be held to no stricter requirement of assuring environmental quality than local residents acting through their representatives demand"). We do note, however, that according to the study there seems to be no safe way to dispose of sewage for four of the lots; we assume that unless a safe way is found the zoning commission will not allow houses to be built on those lots.
 
 2. Air Quality, Soil, Esthetics
 
 12
 These are all addressed in the final EA, and we find that the conclusion of no significant impact was not arbitrary and capricious.
 
 3. Endangered and Threatened Species
 
 13
 The NEPA regulations require that the agency consider "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." 40 C.F.R. Sec. 1508.27(9). Lockhart argues that the proposed development will harm bald eagles and peregrine falcons that inhabit the area. Bald eagles and peregrine falcons have been classified as protected species under the Endangered Species Act (ESA), 16 U.S.C. Secs. 1531-1544 (1988). On appeal, however, Lockhart claims a violation only of NEPA, not of the ESA itself. Lockhart claims that the Forest Service failed to give proper weight to sightings of the birds by local landowners and that the Service's own studies were sloppily done and inaccurate; therefore, she argues, the Service arbitrarily and erroneously concluded that the proposed development would have no significant impact on the endangered birds.
 
 
 14
 The evidence does conflict as to whether eagles and falcons frequent or nest on the tract. The record contains several letters and affidavits reporting sightings of eagles and falcons and claiming that they nest on the site; the Forest Service's opposite conclusion, however, is also well supported by evidence. The Forest Service conducted two field surveys of the site and consulted several other relevant studies that had already been done. The studies conclude that Dark Canyon is not critical habitat for either species. No nesting sites were found during the field surveys, nor did the surveyors observe any eagles or falcons on or near the land. Bald eagles are not believed to nest in the Black Hills at all; they do spend the winter there, but the Dark Canyon site is not in a known winter concentration area, according to the studies. As for the peregrine falcons, the last confirmed sighting of a falcon eyrie was in Dark Canyon, but that was in 1960. The recent studies done by the Forest Service conclude that Dark Canyon is not prime habitat for peregrines because the cliffs are not high enough and because there is too much human activity nearby. Dark Canyon was rejected as a release site for these very reasons when the Forest Service was trying to reintroduce peregrine falcons into the Black Hills in 1979.
 
 
 15
 While the Forest Service's conclusion may not be undisputed, it is certainly not unsupported by evidence. As the court said in Louisiana ex rel. Guste v. Verity, "[O]ur deference to the agency is greatest when reviewing technical matters within its area of expertise, particularly its choice of scientific data and statistical methodology.... [W]here, as here, the agency presents scientifically respectable conclusions ... we will not displace the administrative choice." Louisiana ex rel. Guste v. Verity, 853 F.2d 322, 329 (5th Cir.1988). Therefore, we find that the Forest Service's determination that the exchange would have no significant impact on endangered and threatened species was not arbitrary and capricious.
 
 4. Historic and Cultural Resources
 
 16
 Under the NEPA regulations, in determining whether the proposed action will significantly affect the environment, the agency must consider "unique characteristics of the geographic area such as proximity to historic or cultural resources," 40 C.F.R. Sec. 1508.27(3), and "[t]he degree to which the action may adversely affect ... sites ... listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historic resources," 40 C.F.R. Sec. 1508.27(8). The Forest Service commissioned a survey of the tract to identify any historic or archaeological sites; none were found. It also searched its files to find out if any such sites had been previously identified, again without success. The final EA concluded that the tract contained no historic or cultural resources, and the South Dakota Historic Preservation Office concurred in the finding. Thus, the Forest Service did make an effort to determine whether any historic or cultural resources would be affected by the proposed development, and the requirements of NEPA were met.
 
 5. State and Local Law
 
 17
 Subsection (10) of 40 C.F.R. Sec. 1508.27 requires that an agency consider whether its proposed action "threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment." Although the EA included copies of and discussed the applicable county and city zoning ordinances, it did not discuss any other state or local law. The state statutes Lockhart cites in her brief are broad provisions expressing state policy in favor of safe waste disposal, against water pollution, and in favor of maintaining air quality. None of them cover any ground not included in NEPA. Hence, although the Forest Service should have specifically referred to these statutes, its error was harmless because the EA covered the same subject matter.
 
 6. Other Effects
 
 18
 Citing 40 C.F.R. Sec. 1508.27, Lockhart claims that the Forest Service was required to consider the sociological and community effects of the land exchange and housing development; however, Sec. 1508.27 contains no language to that effect. It does say, as Lockhart points out, that the agency should consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. Sec. 1508.27(4). Lockhart claims this requirement was not met because the Forest Service got eight letters from neighbors protesting the exchange, none in favor of it, and yet did not discuss public opposition in the EA. This argument fails because "controversial" refers to the existence of a "substantial dispute ... as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use." See Rucker v. Willis, 484 F.2d 158, 162 (4th Cir.1973); North Dakota v. Andrus, 483 F.Supp. 255, 258-59 (D.N.D.1980).
 
 
 19
 Lockhart points to the affidavit of Dr. Ken Fish as evidence that the Forest Service overlooked the "[u]nique characteristics of the geographic area," 40 C.F.R. Sec. 1508.27(3), and "[t]he degree to which the action ... may cause loss or destruction of significant scientific, cultural, or historical resources," 40 C.F.R. Sec. 1508.27(8). Dr. Fish, a professor of biology, stated that every year he takes his students on a field trip to Dark Canyon and that it is of unique educational and scientific value to him and his students. While the plaintiff in a NEPA suit may submit evidence showing substantial environmental issues the agency missed, use of the area for biology field trips does not by itself qualify as a substantial environmental issue that would render the agency's decision arbitrary and capricious, particularly in light of the fact that the information in Dr. Fish's affidavit could have been presented earlier, during the administrative process.
 
 7. Resale
 
 20
 In September 1990, Lockhart submitted a letter calling the court's attention to a new development in the case: Van Etten was advertising the land for sale, apparently having abandoned her plans to develop it herself. Lockhart argues that the new purchaser could pursue development plans different from those considered by the Forest Service, with potentially disastrous consequences to the environment. She urges that the district court's grant of summary judgment should be reversed and the case remanded on this ground.
 
 
 21
 When the government sells or exchanges federal land, it must consider the environmental impact of the proposed use of the federal land by the private purchaser, but it need not consider the possible impact of use by hypothetical subsequent purchasers. Once the land passes into private hands, later sales are no longer subject to NEPA. We would scrutinize the matter more closely if there were anything to suggest that Van Etten's purchase was a sham--that she obtained the land in order to resell it to someone else so that the real purchaser could evade NEPA scrutiny. Here, however, the resale is clearly a product of the long administrative and judicial process rather than an attempt to evade it.[6] This court's task is to make sure the Forest Service considered the information available at the time it made its decision; if the agency's decision was proper at the time it was made, our inquiry is at an end.
 
 B. AIRFA/First Amendment
 
 22
 Lockhart next argues that the Forest Service violated the American Indian Religious Freedom Act (AIRFA), which provides: "[I]t shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian ... including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." 42 U.S.C. Sec. 1996 (1988). First, Lockhart claims a procedural violation of AIRFA in that the Forest Service failed to consult with Indian spiritual leaders before making its decision. AIRFA contains no such consultation requirement. AIRFA is merely a statement of federal policy to protect Indians' exercise of their religion; it confers no cause of action. Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 108 S.Ct. 1319, 1328, 99 L.Ed.2d 534 (1988). The original version of AIRFA contained a one-time consultation requirement; section 2 of the session law, left uncodified, directed that all federal departments and agencies evaluate their policies and procedures in consultation with native American traditional religious leaders to determine changes necessary to preserve Indian religious rights and practices, but this one-time review was to be completed by August 11, 1979, three years before the Van Etten exchange was proposed. Pub.L. No. 95-341, Sec. 2, 92 Stat. 470 (1978); see Lyng, 108 S.Ct. at 1328. Also, the language of the section indicates that it required consultation about a generalized revamping of agency policies and procedures, not about specific decisions like this one.[7]
 
 
 23
 Second, Lockhart claims a substantive violation of AIRFA. She contends that AIRFA and the free exercise clause of the first amendment require the agency to take into account Indian religious concerns in making its decision, citing Lyng for the proposition that agencies have a legal duty to accommodate Indian religious practices. While the Supreme Court in Lyng did say that "[t]he Government's rights to the use of its own land ... need not and should not discourage it from accommodating religious practices like those engaged in by the Indian respondents," 108 S.Ct. at 1328, this language is purely precatory. The Court's holding was that AIRFA creates no judicially enforceable rights. See id. at 1328; see also Crow v. Gullet, 706 F.2d 856, 858 (8th Cir.) (AIRFA creates no rights beyond those granted by the first amendment), cert. denied, 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983). The first amendment does not require the government to conduct its own affairs to comport with the religious beliefs of its citizens. Lyng, 108 S.Ct. at 1325; see also United States v. Means, 858 F.2d 404, 407 (8th Cir.1988) (listing cases refusing to overturn governmental land management decisions challenged by Indians on free exercise grounds), cert. denied, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 575 (1989). In fact, the Court commented in Lyng, to limit the government's use of its own land to avoid disrupting religious ceremonies might well violate the first amendment as it would impose a "religious servitude" on the property and subsidize the religion in question. 108 S.Ct. at 1328.
 
 
 24
 Lockhart also appears to base her claim of failure to consider religious factors on NEPA, as she complains of the "arbitrary and capricious manner in which religious factors were ignored" and says there is evidence of a "substantial environmental impact" on Indian religious practices. Reply Brief at 17. NEPA, however, does not mandate consideration of a proposal's possible impact on religious sites or observances.
 
 III.
 
 25
 Because we hold that the Forest Service complied with the requirements of NEPA, that it did not violate AIRFA or the first amendment, and that its decision to proceed with the land exchange was not arbitrary and capricious, we affirm the decision of the district court.
 
 
 
 [1]
 The Honorable Richard H. Battey, United States District Judge for the District of South Dakota
 
 
 [2]
 "If the appeal record is considered inadequate to affirm or reverse a decision, the Reviewing Officer may suspend the appeal process and request additional information, or remand the case for further action." 36 C.F.R. Sec. 211.18(q) (1989)
 
 
 [3]
 On approximately August 21, 1990, Van Etten put the land up for resale
 
 
 [4]
 Before Marsh, the Eighth Circuit had reviewed agency decisions not to prepare an EIS under a standard of reasonableness in the circumstances. See, e.g., Minnesota Pub. Interest Research Group v. Butz, 498 F.2d 1314, 1320 (8th Cir.1974). In Goos, 911 F.2d at 1292, a panel of this court recognized that these earlier cases were incorrect; however, in Marsh, the Supreme Court said that in practice the difference between the two standards is not of much consequence and should not require extensive reworking of established NEPA law. 109 S.Ct. at 1861 n. 23
 
 
 [5]
 It is undisputed that the development would be subject to both the Pennington County and Rapid City zoning ordinances. The city ordinance applies because the land is within three miles of the city limits
 
 
 [6]
 According to letters in the record, Van Etten found it difficult to afford the interest payments on the land without the anticipated revenue from selling the houses
 
 
 [7]
 Although it is legally irrelevant, we note that the record shows that the Forest Service erred on whether a consultation had taken place; its summary of a conference with Indian spiritual leaders states that the Van Etten exchange was discussed, whereas the transcript of the conference shows that it was not