# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3267

_____

| | | |
|---|---|---|
| Heartwood, Inc., a not-for-profit corporation; Jim Bensman, | * * * | |
| Plaintiffs/Appellants, | * * | |
| v. | * * | |
| United States Forest Service; United States Fish and Wildlife Service, | * * * | Appeal from the United States District Court for the Eastern District of Missouri. |
| Defendants/Appellees, | * * | |
| Mercantile Lumber Co., Inc.; Mark Twain Timber Purchasers Group, | * * * | |
| Intervenor Defendants/Appellees. | * | |

_____

Submitted: May 13, 2004
Filed: August 25, 2004

_____

Before MORRIS SHEPPARD ARNOLD, BEAM, and MELLOY, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Heartwood, Inc. and Jim Bensman (referred to collectively as Heartwood) appeal the district court's[1] grant of summary judgment in favor of the United States Forest Service (USFS) and the United States Fish and Wildlife Service (FWS). For the reasons stated below we affirm the district court.

I.

Heartwood challenges the USFS's approval of the Eastwood II Project located in the Mark Twain National Forest (MTNF) in Missouri. The project includes plans to harvest timber. Heartwood argues that approval was inappropriate because the USFS violated the National Environmental Policy Act (NEPA), *see* 42 U.S.C. §§ 4321-4370f, by approving the project without preparing an environmental impact statement (EIS), and because the USFS violated the Endangered Species Act (ESA), *see* 16 U.S.C. §§ 1531-1544, by not conducting new surveys at the project area for the endangered Indiana bat.

II.

NEPA requires that federal agencies follow certain procedures to examine the environmental impact of their proposed actions. If an agency proposes a "major Federal action [that] significantly affect[s] the quality of the human environment," NEPA requires that the agency prepare an EIS that, among other things, details "the environmental impact of the proposed action." 42 U.S.C. § 4332(C). An EIS, however, is not required if the agency first prepares an environmental assessment (EA) providing "sufficient evidence and analysis" that no EIS is necessary because the proposed action will not significantly affect the quality of the human environment. *See* 40 C.F.R. § 1508.9. In those circumstances, the agency issues a

---

[1]The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri.

finding of no significant impact (FONSI) rather than preparing an EIS. 40 C.F.R. § 1508.13.

In some cases, an agency will compile a large programmatic EIS and, as specific components of the program are ready to be implemented, complete a site-specific EIS or EA that expands on the larger EIS. The subsequent EIS or EA need "only summarize the issues discussed in the broader statement ... [and] concentrate on the issues specific to the subsequent action." 40 C.F.R. § 1502.20. The Council on Environmental Quality (CEQ) permits this procedure to avoid "repetitive discussions of the same issues and to focus on the actual issues ripe for decision." *Id.*

Heartwood argues that the USFS violated NEPA by failing to prepare a site-specific EIS for the Eastwood II project. We require that an agency, in reaching its conclusion to forego an EIS, take a "hard look" at the project's potential impacts, identify the "relevant areas of environmental concern," make a "convincing case that the impact was insignificant," and, if the impact is determined to be significant, convincingly establish that changes in the project will sufficiently reduce that impact. *Audobon Soc'y of Cent. Ark. v. Dailey*, 977 F. 2d 428, 434 (8th Cir. 1992). It is undisputed that the USFS completed a programmatic EIS that included all of its proposed projects in the MTNF. With respect to the Eastwood II project, the USFS considered multiple alternatives (including a no-action alternative), addressed public concerns about the project in an EA, and issued a decision notice that included a FONSI.

The CEQ has promulgated regulations detailing how agencies should fulfill their NEPA obligations. The CEQ's regulations list ten considerations that agencies should take into account when taking a "hard look" at whether a project will have "significant" environmental impacts, including the "degree to which the action may adversely affect an endangered or threatened species," the "degree to which the effects on the quality of the human environment are likely to be highly controversial,"

-3-

the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," and the "[u]nique characteristics of the geographic area such as proximity to ... park lands, ... [or] wild or scenic rivers." 40 C.F.R. § 1508.27(b)(3), (4), (5), (9). If an agency takes a "hard look" and determines that the proposed action has no "significant" environmental impact, an EIS is unnecessary.

A.

The CEQ regulations list the "degree to which the action may adversely affect endangered or threatened species" as one of the matters that ought to be considered in deciding whether to issue an EA or an EIS. 40 C.F.R. § 1508.27(b)(9). Prior to reaching its decision, the USFS prepared a biological evaluation that concluded that the Eastwood II project area had no known caves or mines that could serve as winter habitat (hibernacula) for Indiana bats. At the time that the evaluation was completed, the nearest capture of a reproductively active female Indiana bat was made approximately 80 miles north of the project area and the nearest maternity colony was 100 miles west of the project area. Although a recent timber project led to the discovery of a maternity colony 35 miles northeast of the Eastwood II site, this information was not known at the time that the USFS made its decision to approve the Eastwood II project.

As part of formal consultation with the USFS, the FWS completed a biological opinion (BO) for the Eastwood II project that concluded that "adverse effects are likely to occur to the Indiana bat," but that these effects were "not likely to jeopardize [the bat's] continued existence." The BO explained that the "only potential impact to the species [within the Eastwood II project area] would be during spring and fall migration" and could occur from removing potential roost trees and prescribed fires when bats are using the trees or when winds could drift smoke into a hibernaculum 14 miles away. The BO, however, concluded that "[t]he likelihood of cutting a tree containing an individual roosting Indiana bat ... is anticipated to be extremely low

because of the large number of suitable roost trees present on the MTNF and the rarity of the species" in the area. And, while "[d]irect mortality or injury to individuals or small groups of roosting bats may occur during the accidental burning of ... trees that may harbor undetected roosts (if, in fact, such roosts occur within the proposed action area), or removal of potential roosting trees during and after the prescribed fires," "the effects of prescribed burning is expected to be minimal due to the low density of Indiana bats documented within the project area and the 14-mile distance to the closest occupied hibernacula."

After the FWS prepared the BO, the USFS evaluated the severity of the effect of the project on the Indiana bat and determined that the project would "have no additional effects beyond those identified" in the BO and a previous biological assessment, which both concluded that the "action [was] not likely to jeopardize the continued existence of the Indiana bat" and that the effects of the project would be minimal. The USFS concluded that the "possibility of [harming] an individual Indiana bat or bats is remote." Specifically, "the possibility of direct impacts to Indiana bats is extremely low, and the possibility of indirect impacts (removal of suitable roost trees or change in preferred foraging acres) is also low."

The above findings support the USFS's ultimate "finding of no significant impact." The operative word here is "significant." While the FWS detailed some potential impacts, it found that they were unlikely to occur and would not have a significant impact on the species. The USFS used its expertise, along with its consultation with the FWS, to conclude that the degree to which the project may adversely affect the endangered Indiana bat was small. *Cf. Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 374-77 (1989).

The BO requires the USFS to implement "all pertinent reasonable and prudent measures ... to minimize the impact of the anticipated incidental take of Indiana bats" in order to insure that any harm that does occur is not significant. "Take" is defined

under ESA to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. § 1532(19). By approving the Eastwood II project, the USFS did not give itself a green light to disregard the project's impact on the Indiana bat. Should that impact turn out to be significantly adverse, the USFS will be required to adjust the project accordingly.

### B.

The CEQ regulations require that an agency consider the degree to which the effects of projects are "likely to be highly controversial" and the extent to which their possible effects are "highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508(b)(4), (5). The term " 'controversial' refers to the existence of a 'substantial dispute ... as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use.' " *Lockhart v. Kenops*, 927 F.2d 1028, 1035 (8th Cir. 1991), *cert. denied*, 502 U.S. 863 (1991) (quoting *Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir. 1973)). Even if public opposition could create a controversy, in the decision notice (which, in addition to including a FONSI, referred to four alternatives discussed in the EA), the district ranger changed some prescriptions for individual tree stands from clear-cutting to thinning in response to public concerns regarding the preservation of a nearby creek. If a controversy existed, it was resolved.

Heartwood argues that there is a dispute about the effect of the Eastwood II project on the Indiana bat, but it has presented no scientific evidence to support its claim. It is undisputed that causes of the Indiana bat's decline throughout Missouri remain uncertain. Heartwood has presented no evidence, however, that calls into question the conclusion of the USFS and the FWS that the project's effects on the bat will be, at most, minimal. Thus there is no controversy or uncertainty about whether this project would aggravate the bat's decline.

Lastly, Heartwood points to differing recommendations of two USFS foresters. These recommendations, however, differed only as to specific prescriptions for

individual tree stands (thinning versus clear-cutting); they did not disagree about the "size, nature, or effect" of the Eastwood II project. The disagreements evidence that the USFS took a "hard look" at the proposed actions by considering differing opinions within (as well as without) the agency; they do not demonstrate a substantial dispute about the project itself. One forestry expert is likely to disagree with another in his or her evaluations of individual tree stands given the myriad factors that are incorporated into the decision process, including environmental, economic, aesthetic, and future growth concerns.

## C.

The CEQ regulations require an agency to consider the "[u]nique characteristics of the geographic area such as proximity to ... park lands, ... wild and scenic rivers, or ecologically critical areas" when determining whether a proposed project will have a significant environmental impact. 40 C.F.R. § 1508.27(b)(3). The Eastwood II project area is near the Ozark National Scenic Riverways, which is managed by the National Park Service and includes the Current River National Scenic Riverway. The Current River is over a mile away from the Eastwood II project, but the project's effects on it were nevertheless considered in the EA and found to be insignificant in a section examining the direct and indirect effect on "Water/Riparian and Soil Resources." The EA also considered the impacts on biological diversity, specifically within the Ozark-Ouachita Highlands area that "is a unique feature of the North American landscape," and on recreational resources, including the impact of noise on hunting, camping, and hiking, increased traffic during logging operations, unattractive conditions, and disturbance to wildlife. The EA also explained how the project would improve visitor safety at a trailhead for the Ozark Trail, thus improving the visitor's recreational experience. Heartwood correctly points out that the decision notice did not directly address the Current River National Scenic Riverway, but it incorporated the EA which more than adequately examined the "unique characteristics of the geographic area" and found that the project would have no significant impact on the surrounding environment.

## D.

Finally, a CEQ document suggests that an EA longer than 15 pages signals that an EIS may be more appropriate. *See* Forty Questions, 46 Fed. Reg. 18,026, 18,037 (March 23, 1981). We disagree. It makes scant sense to require the USFS to compile an EIS merely because it chose to issue a detailed EA that included EIS-like information about its decision process, including a thorough discussion of proposed alternatives. Even though the CEQ regulations did not require it, prior to completing the EA, the USFS conducted "scoping" (mailing letters to interested parties to solicit any issues relevant to the project) and had a public comment period. Much of the EA was devoted to addressing the public concerns that the USFS learned of through these processes. A rule requiring an EIS whenever an EA is longer than 15 pages would encourage agencies to produce bare-bones EA's. The EA in this case thoroughly considered the potential impacts on endangered and threatened species, biological diversity, vegetation, riparian and soil resources, recreation, and migratory birds, as well as the future health of the forests in the Eastwood II project area. What ultimately determines whether an EIS rather than an EA is required is the scope of the project itself, not the length of the agency's report. Lastly, the 15-page suggestion is non-binding on this court because it is not a regulation but was merely included in a CEQ document entitled, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations." *See Friends of the Earth v. Hintz*, 800 F.2d 822, 837 n.15 (9th Cir. 1986), and cases cited therein.

## E.

It is apparent to us that the USFS did not act arbitrarily and capriciously in determining that the Eastwood II project would have no significant impact on the environment. Thus, they were not required to complete an EIS rather than an EA. The agency did not violate NEPA.

## III.

ESA requires that all federal agencies "seek to conserve endangered species and threatened species," 16 U.S.C. § 1531(c)(1), and prohibits any unauthorized "take" of an endangered species, 16 U.S.C. § 1538(a)(1)(b). As noted earlier, "take" means "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. § 1532(19). Agencies are required to insure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical] habitat of such species." 16 U.S.C. § 1536(a)(2). In fulfilling this requirement, agencies must use "the best scientific and commercial data available." *Id*.

Subject to two exceptions not applicable here, *see* 50 C.F.R. § 402.14(b), if an agency determines that its action "may affect" a threatened or endangered species, the agency must formally consult with the FWS, *see* 50 C.F.R. § 402.14(a). Where, as here, the agency engages in formal consultation, the FWS issues a BO that provides an in-depth analysis of the effects of the action on the endangered or threatened species and its opinion whether the project is "likely to jeopardize the continued existence" of the species. See 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2)(3). The BO also includes a summary of the data underlying the FWS's opinion. 50 C.F.R. § 402.14(h)(1). If the BO concludes that the agency's proposed action is not likely to jeopardize the continued existence of the species, the FWS can issue an "incidental take" statement. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). This statement allows for a specified amount of take incident to the project's completion and lays out procedures that the FWS deems necessary to minimize the impact of any taking. The agency is required to implement the FWS's procedures and comply with any other terms or conditions included in the statement. If, as the project progresses, new information becomes available that casts doubt on the thoroughness or accuracy of the BO, formal consultation must begin anew.

It is undisputed that the USFS followed this procedure in considering the impact of the Eastwood II project on the endangered Indiana bat. Heartwood does not contend that the USFS and the FWS ignored existing data but argues that ESA required the agencies to conduct new surveys before the "no jeopardy" determination was made. The EA prepared by the USFS, however, determined that the existing information available about locations and potential habitats of the Indiana bat in the Eastwood II project area was "of sufficient quantity, quality, and relevance to make an accurate and complete analysis of potential effects" and that additional surveys were "not needed" for the district ranger "to make a reasoned management decision."

During the winter, Indiana bats hibernate in caves or abandoned mines. In summer, bats use forested areas for roosting, foraging, and raising young. Males generally stay within ten miles of the hibernaculum. Females, on the other hand, establish maternity colonies farther away from the cave. Known maternity colonies have been found primarily in prairie areas of Iowa, Illinois, Indiana, and northern Missouri. Maternity colonies generally contain 100 or fewer adult female bats. Indiana bats use mostly dead and dying trees to roost. The most suitable roost trees are large and have flaking bark with space between the bark and the tree bole, cavities, hollow portions, or crevices where bats can roost. Both male and female Indiana bats return to the hibernaculum in the fall to mate and to prepare for winter hibernation.

There are only two active Indiana bat hibernacula on the MTNF, and the nearest one to the Eastwood II project is more than 14 miles away. At the two caves, traps yielded four male Indiana bats during 15.5 hours of effort in 1998. In 2001, a census at the cave nearest the Eastwood II project turned up one hibernating bat during the winter hibernation period.

Mist-netting was performed in two districts of the MTNF, including a larger region that contains the Eastwood II project area, in 1997 and 1998. In 1997, no

Indiana bats were captured during 95 hours of effort. No Indiana bats were caught in 1998 despite 123.5 hours of effort. Additional mist-netting at the MTNF was conducted between 1999 and 2001, including 36 hours of effort within one mile of the Eastwood II project, but no Indiana bats were captured.

As of August, 2001 (when the FONSI was issued), no reproductively active female Indiana bat had ever been found in the MTNF, but two reproductively active females were captured on land adjacent to the MTNF. In May, 2004, however, the Army Corps of Engineers discovered an Indiana bat maternity colony within a proposed timber sale area in the MTNF approximately 35 miles northeast of the Eastwood II project area. Mist-netting had been conducted in this area but did not yield any bats. As a result of this discovery, the USFS has withdrawn this area from its timber sale project and is proposing greater protection. While Heartwood suggests that this discovery demonstrates why the USFS should be required to conduct more surveys to seek out Indiana bats, we believe that it instead demonstrates how difficult it is to find Indiana bats even with nearby surveys and mist-netting.

The USFS and the FWS relied on sufficient surveys existing in August, 2001, to draw their conclusion that any impact by the Eastwood II project on the Indiana bat will be insignificant and minimal and that the project will not jeopardize the continued existence of the bat. Should new information come to light (and, as the recent example demonstrates, it will most likely be from activities within the area rather than mist-netting), the USFS will be required to reevaluate its conclusions and adjust the project accordingly.

The FWS's BO requires that the USFS take additional measures to protect the Indiana bat. First, the USFS must "designate [a] protective buffer around the roost or site" if an Indiana bat maternity colony is discovered at any time in the Eastwood II project area. Second, the USFS must "continue its efforts to determine habitat use of the National Forest by Indiana bats during the hibernation, summer

roosting/maternity, and pre-hibernation seasons by ... continued, regular monitoring of occupied Indiana bat caves on the MTNF ... [and] monitor[ing] the extent of use [by] Indiana bats on all districts of the MTNF."  And, throughout the Eastwood II project, the USFS must monitor the amount of incidental take and "the number of suitable roost trees and preferred foraging habitat available to the species."

Even if bats are more prevalent in the Eastwood II project area than mist-netting and surveys suggest, it is worth noting that the FWS's draft revised recovery plan for the Indiana bat stated that "[t]imber harvest activities neither directly damaged known roosts nor discouraged bats from continuing to forage in one harvested area ... in Illinois."  Additionally, the FWS noted that Indiana bats have been discovered roosting in shelterwood cuts in Kentucky: "A couple of maternity colonies ... were found when [the roosting] tree was cut down and the bats moved to another tree.  These observations suggest that the Indiana bat may be a more adaptable species than previously thought."

The requirement that agencies use the "best scientific and commercial data available," 16 U.S.C. § 1536(a)(2),  does not require an agency to conduct new studies when evidence is available upon which a determination can be made. *See Southwest Ctr. for Biological Diversity v. Babbit*, 215 F.3d 58, 60 (D.C. Cir. 2000). All that is required of the agencies is to seek out and consider all existing scientific evidence relevant to the decision at hand. *See id*. at 60-61.  They cannot ignore existing data.  That did not occur in this case.

The USFS and the FWS formally consulted twice, once on a programmatic level and once for the Eastwood II project specifically.  After each consultation, the FWS issued "no jeopardy" opinions based on existing data.  While future surveys and things that occur during the project itself may provide new information about the presence and habitat of the Indiana bat in the Eastwood II project area, the conclusions of the USFS and the FWS were well supported by the administrative

record which included all available data that then existed on the Indiana bat and the Eastwood II project area.

The USFS and the FWS did not act arbitrarily and capriciously in determining that the existing data on Indiana bats was sufficient to conclude that the Eastwood II project was not likely to jeopardize the species. Thus, no violation of ESA occurred.

## IV.

For the reasons stated above, we affirm the district court's grant of summary judgment in favor of the USFS and the FWS.

_____