**AUDUBON SOCIETY OF CENTRAL ARKANSAS, et al., Plaintiffs,**

v.

**Jim DAILEY, et al., Defendants.**

**Civ. No. LR–C–91–30.**

United States District Court, E.D. Arkansas, W.D.

April 1, 1991.

Webster L. Hubbell, Rose Law Firm, Little Rock, Ark., for plaintiffs.

Thomas M. Carpenter, City Attorney's Office and William C. Adair, U.S. Attorney's Office, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

Plaintiffs filed suit on January 11, 1991, seeking declaratory and injunctive relief

enjoining the issuance by the United States Department of the Army Corps of Engineers (COE) of its permit under Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403) and Section 404 of the Clean Water Act (33 U.S.C. § 1344) authorizing the City defendants to deposit fill material for constructing a bridge over Jimerson Creek and a jogging path in connection with the extension of Rebsamen Park Road. Besides the alleged violations of environmental laws and regulations promulgated under the National Environmental Policy Act (NEPA), the Clean Water Act, and by the Environmental Protection Agency (EPA) and the COE, plaintiffs also asserted that the construction contract was let before the expiration of the 30–day mandatory referendum period in violation of municipal law rendering the contract void. The complaint was amended on January 25th to add Joyner–Ford and Burke (Joyner), the construction company, as a defendant.[1]

Plaintiffs filed a motion for preliminary injunction on February 5th. On February 14th, they filed a report with the Court that they had been unable to get the City to maintain the status quo until the Court could hold a merged hearing on the motion for preliminary injunction with the trial on the merits. Plaintiffs moved for a status quo order. Defendants responded to the motion for preliminary injunction on February 15th and the federal defendants responded to the status quo order on February 20th. A telephone conference was held on February 21st regarding plaintiffs' motions for preliminary injunction and for status quo order. By order filed that same date, the Court scheduled ·a merged hearing/trial for March 25, 1991. The motion for status quo order was denied by the Court during the conference.

On March 5th, plaintiffs filed a motion for a temporary restraining order (TRO). The City defendants filed a response on March 8th and an amended response on March 12th. The federal defendants filed a response on March 12th. By order filed on March 12th, the Court found that a tempo-

rary restraining order (TRO) should issue upon the posting of a $5,000.00 bond by plaintiffs. Defendants were enjoined from proceeding any further with construction of the bridge over Jimerson Creek including such preparatory work as the placement of rip-rap and with construction of the roadway to the immediate east of Jimerson Creek. The TRO, which was entered at 4:15 p.m., was to remain in effect for ten days from the date and time of issuance.

On March 21st, plaintiffs moved for a continuance of the TRO. The City defendants filed a response on March 22nd that construction to the west of Jimerson Creek is scheduled to be completed by March 26th or 27th. By order filed on March 22nd, the Court found good cause for extending the TRO for an additional ten days from the date and time the order was entered.

The parties agreed to submit the case to the Court on cross-motions for summary judgment. Defendants filed their motion for summary judgment on March 14th with supporting brief, a statement of facts they contend are undisputed in compliance with Local Rule 29, affidavits, and exhibits along with the administrative record (AR). Plaintiffs responded to defendants' summary judgment motion on March 21st and filed their own cross-motion for summary judgment that was supported by affidavit and a Local Rule 29 statement of undisputed facts. The federal defendants filed their response on March 26th and the City defendants filed their response/reply on March 27th. Plaintiffs filed a reply on March 27th and an amended Local Rule 29 statement on March 28th.

At the suggestion of defendants and the agreement of plaintiffs, the Court, along with counsel for the parties, viewed the Rebsamen Park Road/River . Mountain Road area including Jimerson Creek on the morning of March 26th. Oral argument was heard on March 28th. Upon inquiry by the Court at the conclusion of counsel's presentations that afternoon, counsel met to consider settlement and counsel for the

---

**1.** For the remainder of the opinion, the designation of "City defendants" will include Joyner.

City defendants[2] advised after that meeting that he would have to consult the Board about a proposal. On the morning of March 29th, counsel reported that the proposal had not been accepted.

The following facts are established by the parties' Local Rule 29 statements and the AR:

1. The Audubon Society of Central Arkansas (ASCA) is an environmental organization dedicated to the preservation of the natural environment, particularly preserving wildlife habitat and the peaceful coexistence of humans with the environment. The ASCA has over 750 members and is a chapter in good standing of the National Audubon Society.

2. Plaintiff Alice B. Andrews resides in Little Rock, Arkansas. Andrews uses Rebsamen Park's and Murray Park's walking and jogging trails and roads for nature observation and recreational purposes and uses LaHarpe View Park and the undeveloped area west of Jimerson Creek for nature observation and recreational purposes. Andrews is a member of the Pulaski Chapter of the Ozark Society, the National Wildlife Association, and is a past member of the Arkansas Natural and Scenic Rivers Commission.

3. Plaintiff David F. Gruenewald resides in Little Rock, Arkansas. Gruenewald uses Rebsamen Park's and Murray Park's walking and jogging trails and roads for nature observation and recreational purposes and uses LaHarpe View Park and the undeveloped area west of Jimerson Creek for nature observation and recreational purposes. Gruenewald is a member of the Pulaski Chapter of the Ozark Society.

4. Plaintiff Barry H. Haas resides in Little Rock, Arkansas. Haas uses Rebsamen Park, Murray Park and LaHarpe View Park for nature observation and recreational purposes. Haas is a member of the ASCA.

5. Plaintiff Robert H. McKinney resides in Little Rock, Arkansas. McKinney uses Rebsamen Park's and Murray Park's walking and jogging trails and roads for nature observation and recreational purposes and uses LaHarpe View Park and the undeveloped area west of Jimerson Creek for nature observation and recreational purposes. McKinney is a member of the Pulaski Chapter of the Ozark Society, the National Wildlife Federation, the Coalition to Save the Murray Park Area and the Little Rock Road Runners Club.

6. Defendant Jim Dailey resides in Little Rock, Arkansas and is a City Director of Little Rock, Arkansas.

7. Defendant Cyril Hollingsworth resides in Little Rock, Arkansas and is a City Director of Little Rock, Arkansas.

8. Defendant John Lewellen resides in Little Rock, Arkansas and is a City Director of Little Rock, Arkansas.

9. Defendant Sharon Priest resides in Little Rock, Arkansas and is a City Director of Little Rock, Arkansas.

10. Defendant Hampton Roy resides in Little Rock, Arkansas and is a City Director of Little Rock, Arkansas.

11. Defendant Lottie Shackleford resides in Little Rock, Arkansas and is a City Director of Little Rock, Arkansas.

12. Defendant Tom Dalton resides in Little Rock, Arkansas and is City Manager of Little Rock, Arkansas.

13. The City of Little Rock is a municipal corporation of the State of Arkansas.

14. Defendant Colonel Charles C. McCloskey, III, acting in his official capacity as District Engineer, Army Corps of Engineers, resides in Little Rock, Arkansas.

15. The United States Army Corps of Engineers is a department of the United States Army.

16. Defendant Joyner–Ford & Burke Construction Company, Inc. is an Arkansas

---

**2.** While the City Attorney's office represents the interests of Joyner, Joyner's individual counsel entered his appearance at oral argument to present the position of Joyner that was not shared.

corporation and is located in Pulaski County, Arkansas.

17. In 1970, a Consent of Easement was issued to Pulaski County to place fill material from the excavation of I–430 along the west bank of the Arkansas River (River). Fill material was placed along the west bank of the River in the area between the west bank of Jimerson Creek and the I–430 bridge.

18. In 1975, the Arkansas Highway Department (AHTD) applied to the COE for a permit to allow the placement of fill material in Jimerson Creek to allow the construction of a bridge over Jimerson Creek and a road which would extend Rebsamen Park Road to connect with River Mountain Road near the I–430 bridge.

19. The COE gave notice of the AHTD application to relevant federal and state agencies and following receipt of comments and consideration thereof prepared an Environmental Assessment (EA) in which it determined that the issuance of the permit was not a major federal action significantly affecting the quality of the human environment and that an Environmental Impact Statement (EIS) was not necessary. The permit was issued; however, the road and bridge were not built and the permit expired.

20. Later inquiries to the COE by the AHTD in 1981 indicated they were still planning the road, but no further permit applications were received from the AHTD.

21. In 1985, a 24 inch pressurized sewer line was installed across Jimerson Creek and along the proposed roadway between the existing railroad track and the River bank, but in closer proximity to the track. During the installation of the pipeline, a ditch was dug throughout the proposed roadway area and within Jimerson Creek to allow the burying of the pipeline.

22. In the last several years, an AT & T cable has been buried along the proposed roadway in the area between the pipeline and the track.

23. The railroad track is parallel to the proposed street throughout at least 95% of the street. The track has been there for many years and is in current use. A freight train uses the track twice a day and sounds its whistle at each road crossing throughout the Rebsamen Park Road area. The track crosses Jimerson Creek on a multiple piling bridge and limits boat access to Jimerson Creek from the River. Rip-rap consisting of granite stone has been placed along the banks of Jimerson Creek near and under the railroad bridge.

24. In 1987, the City of Little Rock Board of Directors passed an ordinance which referred to the voters of the City a proposed capital improvements bond issue. The ballot title of the bond issue, as it related to streets stated, "On the question of the issuance of bonds in the maximum principal amount of $19,675,000.00 for the purpose of constructing, reconstructing, repairing, straightening, and widening of streets in the City, including curbing, guttering and drainage improvements."

25. Prior to the election on the 1987 bond issue, the City and others included the Rebsamen Park Road extension in the publicity for the top 20 street projects to be constructed with the bond proceeds if the issue were approved by voters. This project, which was originally ranked at the bottom of the top 20 list, was reprioritized by the City in 1989 to the top four or five partly due to the proposed 40–acre Riverdale Harbour development of marina, clubhouse restaurant, high-rise apartments and office and commercial buildings. The harbor developer observed that the road extension would provide easy westward access to the area.

26. The 1987 bond issue was approved by a majority of the voters. The total votes cast were 13,278.

27. After approval of the bond issue by the voters, the City submitted an application to the COE for a permit to allow the placement of fill material in and along Jimerson Creek (Creek) banks to allow the construction of a bridge over the Creek and for the placement of fill in and along certain areas of the River bank to allow the construction of bike paths. The great amount of fill to be used for the construction of the bridge is reflected at Sheet 11 of

the Preliminary Plat in Volume 5 of the AR. The street proposed to be built across the Creek is to extend Rebsamen Park Road to connect with River Mountain Road, west of I-430.

28. The City Board passed Ordinance No. 15,989 on December 18, 1990, appropriating monies for construction and authorizing a contract for construction.

29. 1987 Capital Improvement Bond Issue funds have been allocated to the Rebsamen Park Road Project in the amount of $1,044,580.00. Additions to the project have increased the cost estimate to $1,250,000.00.

30. Other than public approval of the 1987 bond issue to finance construction of the street, the project has never been submitted to public referendum.

31. Current City plans call for use of the bond proceeds and other funds for such purposes as:

(i) constructing of bikeways;

(ii) constructing of gateways;

(iii) constructing of a security fence around the lock and dam facilities;

(iv) constructing walking/jogging paths;

(v) landscaping;

(vi) purchasing surplus railroad flat cars to be used as the deck of a new bridge over Jimerson Creek;

(vii) constructing a bridge over Jimerson Creek;

(viii) installing a railroad crossing signal;

(ix) paying design fees to a local consulting engineer; and

(x) construction of the street surface.

32. The application for permit was filed under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act.

33. During the permit review process, the COE gave notice of the application to applicable federal and state agencies, including, but not limited to, such agencies as the Technical Review Committee of the State of Arkansas, U.S. Fish and Wildlife Service, Arkansas Game and Fish Commission, Arkansas Department of Pollution Control and Ecology, Federal Emergency Management Agency, Arkansas Archeological Survey, U.S. Environmental Protection Agency, and the Arkansas Department of Parks and Tourism.

34. By letter dated September 6, 1989, the Federal Emergency Management Agency (FEMA) indicated that the proposed work would comply with the City's current Flood Insurance Rate Maps and Floodway Maps dated March 4, 1980.

35. The Arkansas Game and Fish Commission (AG & FC) indicated in a September 7, 1989 memorandum that impacts to fish and wildlife resources will be minor.

36. The Acting Field Supervisor of the U.S. Fish and Wildlife Service (USF & WLS), by letter dated September 8, 1989, indicated that no significant adverse effects on fish and wildlife, their habitat, and human uses thereof are expected from the proposed road extension and the City's plans offer the opportunity to increase public use of the fish and wildlife resources.

37. By letter dated September 11, 1989, the Arkansas Department of Pollution Control and Ecology issued water quality certification for the proposed road pursuant to Section 401(a)(1) of the Clean Water Act.

38. The U.S. Environmental Protection Agency indicated in a telephone conversation on September 18, 1989, that they had no comment on the proposed road extension. No written comments were provided by the EPA.

39. The Arkansas Department of Parks and Tourism (ADP & T), by letter dated September 20, 1989, indicated they would support the proposed road extension if the City makes every effort to ensure the safety and enjoyment of the users of the recreational area by setting the speed limit at no greater than 35 mph and reduced to 20 mph through the activity areas and separating the vehicle lanes and bicycle/pedestrian lane by physical barrier at the bridge, and that the jogging path is developed concurrent with the road construction.

40. The Chairman of the Technical Review Committee of the State of Arkansas indicated in a memorandum dated Septem-

ber 29, 1989, that it was the position of the committee that the permit for the proposed road extension should be approved referencing the recommendations by the ADP & T.

41. Responses to the COE's public notice of the City's application included 64 letters in which 1 was for, 49 were against, and 4 had no opinion. Three petitions were received including one supporting the project with 18 signatures and 2 opposed containing 262 signatures.

42. The COE conducted informal public meetings with citizens, including some of the plaintiffs, and reviewed the project and their concerns regarding the project.

43. The COE conferred with City personnel and officials regarding the project and regarding the comments that it received from citizens.

44. The Little Rock Police Department is a department of the City. The City itself reviewed this project and submitted comments to the COE during the permitting process.

45. The City conferred with the COE and interested members of the public through permit review and, in response to various concerns expressed by some citizens, did revise its original plan to include several revisions as described herein.

46. The City had two informal public meetings regarding the project.

47. Bill Henson, COE Project Manager in the Regulatory Branch, expressed that the permit should be denied as reflected in his notes during a telephone conversation with the City Civil Engineering Chief Jerry E. Gardner concerning the traffic and his notes regarding the travel times on Cantrell and the proposed road. COE Russellville Resident Engineer C.D. Lassiter recommended against the road due to the increased traffic on the potential for incidents at the lock and dam and in generating additional traffic control problems which city police had reportedly stated to lock personnel that they were unable to enforce existing speed limits at the present time.

48. By March 30, 1990 memorandum, McCloskey observed that the COE was the stalking horse and that without a coherent plan from the City to deal with the opposition, he was inclined to deny the permit before any meetings.

49. Additional notes by Henson calculate the traffic counts with different speeds in terms of pedestrians crossing the road and vehicles turning at the intersections. At the peak coinciding recreational and commuter periods, a vehicle would pass every 4.5 seconds with a traffic volume of 8,000 Average Vehicles Per Day (AVPD) and every 3.6 seconds using the 2010 Pulaski Area Transportation Study (PATS) projection approaching 10,000 AVPD. Henson, assuming that recreational traffic would not be deterred so that the 2010 traffic volume could exceed 15,000 AVPD and applying the worst case speed on the proposed road as 45 mph since it is well documented that the traffic on the existing road will use a speed about 10 mph over the posted speed limit, found that a vehicle would pass every 2.4 seconds in peak periods.

50. The COE scheduled and advertised that it would hold a public hearing regarding the project. The hearing conducted by McCloskey was held on July 10, 1990, at the Arkansas Game and Fish Commission auditorium at which time all persons who desired to speak were allowed to speak.

51. The plaintiffs attended the public hearing and spoke or submitted written comments to the COE after the hearing.

52. Public attendance and comments at or subsequent to the COE's public hearing consisted of: About 225 attendees at the hearing where 36 spoke with 22 in opposition, 12 for the proposed road extension and 2 indifferent. There were 93 written individual comments received of which 21 were in favor and 71 opposed, and one indifferent. Three petitions were received which included 2 in favor with 255 signatures and 1 opposed with 155 signatures.

53. During the COE's public comment procedure, three members of the public requested an EIS.

54. The entire street extension is 2.04 miles in length and will be located parallel to the existing railroad track, the AT & T cable, and the sewer pipeline, all of which parallel the River. The street will be located approximately 100 feet north of the railroad track, between the track and the River. It will be a two lane black top street with five foot wide bike lanes on both sides of the street. A separate biking and jogging path will be located along the entire street just as currently exists along the existing portion of Rebsamen Park Road. Gateways will be provided at the east and west entry of the park corridor and stop signs will require traffic to stop before entering the area. The speed limit will be 35 miles per hour.

55. Existing traffic on Rebsamen Park Road just east of the entrance to the golf course is about 2,500 AVPD on the weekend and 2,900 AVPD on weekdays. Predicted traffic on the proposed road extension is 4,500 AVPD shortly after completion with a PATS prediction of 8,600 to 9,000 AVPD by the year 2010. Existing traffic on Cantrell Road is between 16,000 to 20,000 AVPD with a PATS 2010 projection of 19,000 to 30,000 AVPD.

56. A consultant retained by the COE, Ernest J. Peters of Peters & Associates Engineers, Inc., has given the opinion that the expected increase in traffic will be the result of increased through traffic use, not a threefold increase in the use of recreational facilities. While he opined that traffic volumes increasing to only 4,500 AVPD and a compliance with a 35 mph speed limit would be tolerable, adverse impact on the recreational uses the road is intended to serve would result from traffic conditions which exceed the 4,500 AVPD projected by the City. The consultant believed that the PATS projection of volumes of 8,000 to 9,000 AVPD would eventually occur over a five to six year period after completion.

57. The project is being constructed on property owned entirely by the City, west of Jimerson Creek, and the COE, east of Jimerson Creek. The proposed road will pass under I–430 before connecting with River Mountain Road.

58. The proposed road would consist of a 22–foot wide asphalt roadway.

59. The stated purpose of the proposed road extension is to provide more convenient access to the multiple parks and recreation facilities existing along this portion of the River bank, including Murray Lock and Dam, LaHarpe Park, Murray Park, Rebsamen Park and Golf Course. The roadway forms a portion of the City's chain of parks concept.

60. The COE's Engineer Manual for Design of Recreation Areas and Facilities states that recreational roadways should be designed for 20 to 30 mph.

61. Persons in favor of the road extension have commented that the extension would provide another traffic artery if Cantrell Road were blocked by an accident or emergency; that fishing access and viewing by the handicapped would be improved; that tourists from I–430 could use the park; and that with the separate bike lanes and jogging path, it will be safer for these uses.

62. Persons opposing the project have expressed concerns to the COE regarding possible adverse impacts on the following, which are all contained in the AR:

(a) walking;

(b) jogging;

(c) biking;

(d) nature observations that have developed at Murray and LaHarpe View parks;

(e) air quality;

(f) safety of recreational uses because of increased traffic;

(g) safety for bikers, joggers and motorists over the Jimerson Creek bridge;

(h) deterioration of bank fishing and bird watching; and

(i) effects on wetlands.

These concerns were expressed to the COE during the permit review process.

63. The First Draft of the EA by Henson, found at pp. 1061–1096 of the AR, grants the permit, but with the imposition of special conditions including a 25 mph speed limit and a traffic monitoring and measuring plan that would require the con-

struction of traffic blockers to prevent any motorized vehicle traffic across the bridge from 7:15 to 8:15 a.m. and 4:30 to 5:30 p.m. if the through traffic component of Rebsamen Park Road exceeds 1,000 AVPD.

64. The Second Draft of the EA by Benny Swafford and Louie C. Cockmon, found at pp. 1097–1138 of the AR, denies the permit based on the negative impacts. Applying the industry standard and the Institute of Transportation Engineers, Transportation and Traffic Engineering Handbook, the draft found that theoretical maximum recreational use of the recreational facilities along the road will occur at 7,550 AVPD when the traffic increases to the limit where there is just time to leave the road for parking or access the road from parking when in actuality some recreational users will judge the traffic and sight distance unsafe long before that and stop using the park. To offset the projected adverse impacts, special conditions as recited above in the First Draft would be required. However, those conditions would place a very heavy enforcement burden on the COE and would be impossible to enforce. This draft denied the permit as contrary to the public interest.

65. On August 30, 1990, the COE finalized its Final EA Statement of Findings and Permit Determination regarding the project wherein it concluded that the Project was not a "major federal action significantly affecting the quality of the human environment", that an EIS was, therefore, not required, and that the permit was issued. The Final EA, in contrast to the earlier two drafts, does not mention Resident Engineer Lassiter's recommendation of denial due in part to the current traffic enforcement problem. While acknowledging that an expected large increase in traffic through the area could adversely affect recreational uses, the EA concludes that "it is expected that City of Little Rock officials will take whatever traffic control measures are appropriate and necessary to control traffic speeds and volumes and provide safe recreational opportunities for all."

66. The EA is approximately 17½ pages long and discusses, among others, the following topics: (1) history of the project; (2) the permit application; (3) responses to the public notice; (4) COE comments; (5) City's responses; (6) traffic analysis; (7) informal meeting with opposition groups; (8) public hearing; (9) scope analysis; (10) environmental effects; (11) alternatives; (12) COE public interest review; (13) summary of finding; and (14) conclusions.

Within the section dealing with environmental effects, the COE's discussion is broken down into a discussion of the following: (1) present uses and environmental setting; (2) fish and wildlife; (3) wetlands; (4) water quality; (5) endangered species; (6) aesthetics; (7) noise levels; (8) historical and archaeological; (9) recreation and park lands; (10) social and economic; (11) atmospheric quality; and (12) compliance with Section 404b guidelines.

67. In evaluating those activities involving the discharge of dredged or fill material, guidelines were applied which were promulgated by the administrator of the EPA under authority of 404(b)(1) of the Clean Water Act. This analysis is contained in Enclosure 1 to the EA and Statement of Findings. The proposed project complies with 404(b) guidelines as promulgated in 40 C.F.R. 230.

68. The COE discussed and analyzed the project wetlands in two separate sections of the EA. Section 10 entitled "Environmental Affects" (Page 12 of the EA) acknowledges that the project fill sites involve "aquatic sites adjacent to steep banks." The east bank at the bridge location is an area previously disturbed during the construction of the lock and dam. The west bank of the proposed bridge and jogging path are on previously-permitted shale and rock fills.

69. Wetlands in the immediate project area are in a narrow band less than five feet wide on a steep bank and are of poor quality because of previous disturbance. These wetlands only exist in small areas along the shale-rock fill because of the lack of a soils foundation. Total fill in these wetlands is less than 0.1 acres.

In contrast, wetlands also occur, as reflected in Joint Exhibit A and the AR, on both sides of Rebsamen Park Road from the vicinity of Rebsamen Park golf course to east of Murray Park. While the EA states that it is not expected that this wetland area will be impacted by the project, the basis for this conclusion is not given.

70. The City's proposed chain of parks concept was listed as one of ten benefits to the project by the COE is its Final EA.

71. The chain of parks concept itself is a step closer to realization by this project being added to the chain of parks already along existing Rebsamen Park Road.

72. The AR upon which the EA is based is 1195 pages long plus 43 drawings.

73. The EA is not an EIS and does not purport to fulfill the requirements of an EIS.

74. The COE issued the permit to the City on August 31, 1990, for the placement of fill material pursuant to Section 10 of the Rivers and Harbors Act and Section 404 of the Clean Water Act. The permit does not contain any special conditions regarding traffic.

75. The construction of the bridge across Jimerson Creek has been approved pursuant to Section 9 of the Rivers and Harbors Act by the United States Secretary of Transportation (which delegated this authority to the Coast Guard pursuant to 33 C.F.R. § 114.01) by advanced approval pursuant to 33 C.F.R. § 115.70.

76. LaHarpe View Park is owned and operated by the COE.

77. The COE has given the City approval and consent to the construction of a street across COE property near LaHarpe View Park.

78. On December 21, 1990, the City by letter notified Joyner that it would be awarded a contract to construct such project. The City awarded the contract on December 21, 1990, three days after the ordinance appropriating funds was passed and before the constitution referendum period expired. A new Board of Directors was to be seated on January 1, 1991.

Hamp Roy, a new director, asked for information regarding the project.

79. On or about January 7, 1991, Joyner executed the contract.

80. On January 21st, the City issued a proceed order to Joyner to commence construction of the project in accordance with the contract.

81. Joyner commenced work on the project on or about January 22, 1991, and is currently actively working on the project west of Jimerson Creek.

82. Even before the expiration of the applicable deadline, plaintiffs were aware of their right to initiate a referendum regarding the City ordinance and they voluntarily and knowingly decided to not initiate a timely referendum of the ordinance and allowed the deadline to expire. In this case there was no attempt to file any referendum petition, partial or otherwise, with the City Clerk.

83. Joyner has hauled over 200 truck loads of illegally placed garbage out of the project area and has hauled in fill material to raise the grade of the roadbed and has installed numerous culverts in low areas. Joyner has entered into numerous subcontracts for material, some of which has been specially prepared for this project. The City has accepted such work and made progress payments to Joyner.

84. The COE did not find any practicable alternative which would avoid bridging Jimerson Creek, other than the no action alternative. The no action alternative would not fulfill the basic purpose of the project to provide western access to the park, but it would also not have the potential adverse effect on the existing recreational uses caused by the increase in traffic.

85. The safety and socioeconomic issues raised by the plaintiffs in their pleadings are the same ones raised by plaintiffs and others during the permit process before the COE and again to the City Board of Directors before it passed the ordinance appropriating money for the project.

86. Plaintiffs have not identified any agency which was not consulted which

should have been. However, plaintiffs deny appropriate review. None of the agencies that were contacted in the fall of 1989 were aware of the projections for traffic volume as developed by the COE consultant, the COE's own calculations, the PATS and the City's own figures.

87. Plaintiffs have not identified any special habitats, historic sites, or rare or endangered species which will be destroyed forever and irreversibly due to the project.

The Court next turns to the governing law. Under 5 U.S.C. § 706(2)(A), a reviewing court must "... set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." This Administrative Procedure Act standard of review is applicable to the COE's decision not to prepare an EIS. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Lockhart v. Kenops,* 927 F.2d 1028 (8th Cir.1991).

NEPA provides in part, 42 U.S.C. § 4332(2)(C), that an EIS must be prepared for all "major federal actions significantly affecting the quality of the human environment." Defendants have acknowledged that the project is a "major federal action." At 40 C.F.R. § 1508.3, "affecting" is defined as "will or may have an effect on." "Significantly" is defined at 40 C.F.R. § 1508.27 in relevant part as requiring considerations of both context and intensity as follows:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action....

(b) Intensity. This refers to the severity of impact.... The following should be considered in evaluation of intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to ... park lands, ... wetlands, ... or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain....

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about future considerations.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts....

"[I]n making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' [*Citizens to Preserve Overton Park, Inc. v. Volpe,* [401 .U.S. 402], 91 S.Ct. 814, 823 [28 L.Ed.2d 136] (1971).]" *Marsh* 109 S.Ct. at 1861. Applying this standard of review, the Court finds that the COE's decision that the issuance of the permit was not a "major federal action significantly affecting the quality of the human environment" and that an EIS is not necessary to be arbitrary and capricious.

The AR shows that the COE was concerned about the effect of the project on traffic. The City was directed to furnish figures, the COE engaged its own consultant, and COE personnel made various calculations. While the COE might have been taking a "hard look," the COE ultimately chose to ignore what it saw. All the facts and scientific projections showed the tremendous increase in traffic that will occur severely impacting the recreational uses of the area. The City's wishful thinking that the commuting public will choose Cantrell with its approximately eight more stop-

lights for the comparable distance and travel time over Rebsamen Park Road is without justification. The COE's misplaced reliance on the City's empty assurances that it will enforce the 35 mph speed limit flies in the face of the COE's information that the current limits are not being enforced and the public will use a speed limit 10 mph over the existing limits. The COE was not relying on reasonable opinions of any qualified experts in concluding the impacts of the project were not significant when its own consultant and personnel had made reasoned decisions to the contrary based on their evaluations of the available data.

Additionally, the COE noted in the EA that noise levels are expected to increase, but did not discuss the impact. The EA section on aesthetics failed to mention the traffic component. The COE at page 14 of the EA observes that "[a]tmospheric quality may be slightly degraded by an approximate three fold increase in traffic volume through the corridor," but then merely concludes that the adverse impact is not expected to be significant.

The Court must conclude that the COE's decision that the impacts of the project lack significance on the quality of the human environment and the permit should issue is not founded on a reasoned evaluation "of the relevant factors" and that the COE's decision to not prepare an EIS was a "clear error of judgment." As the Court has found that plaintiffs are entitled to summary judgment on their claim that an EIS is required, it will not be necessary to rule on plaintiffs' alternate theories.

Accordingly, plaintiffs are granted summary judgment on their claim that the actions of the defendants violate NEPA, 42 U.S.C. § 4332(2)(C) and 40 C.F.R. § 1502.3, since an EIS is required for this project, a "major federal action significantly affecting the quality of the human environment." The COE is permanently enjoined to suspend Permit No. W–D–050–03–5830 which authorizes the City to place certain fill in the Arkansas River and Jimerson Creek for the approach and abutments of a bridge over Jimerson Creek and the defendants are permanently enjoined from proceeding any further with the construction of a bridge over Jimerson Creek pursuant to that permit until such time as an EIS in conformity with the requirements of NEPA has been completed.

IT IS SO ORDERED.