**AUDUBON SOCIETY OF CENTRAL ARKANSAS; Alice B. Andrews; David F. Gruenewald; Barry H. Haas; Robert H. McKinney, Plaintiffs–Appellees,**

v.

**Jim DAILEY; Cyril Hollingsworth; John Lewellen; Sharon Priest; Hampton Roy; Lottie Shackleford; Tom Dalton; City of Little Rock; Defendants–Appellants,**

**United States Department of The Army, Corps of Engineers; Charles C. McCloskey, III, Colonel, District Engineers, Corps of Engineers; Defendants,**

**Joyner–Ford & Burke Construction Company, Defendants–Appellants.**

No. 91–1764.

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1992.

Decided Oct. 13, 1992.

Thomas M. Carpenter, Little Rock, Ark., argued, for defendants-appellants.

William C. Adair, Little Rock, Ark., argued, for defendant-appellant City of Little Rock.

Webster L. Hubbell, Little Rock, Ark., argued, for plaintiffs-appellees.

Before JOHN R. GIBSON and BEAM, Circuit Judges, and HUNGATE,[*] Senior District Judge.

JOHN R. GIBSON, Circuit Judge.

The City of Little Rock, Arkansas, and various city officials [1] appeal from the district court's [2] order enjoining them and their contractor, Joyner–Ford & Burke Construction Company, from proceeding with construction of a bridge over Jimerson Creek until the Army Corps of Engineers [3] has prepared an environmental impact statement (EIS) regarding its grant of a permit to build the bridge. 761 F.Supp. 640. The district court held that the Corps

---

[*] THE HONORABLE WILLIAM L. HUNGATE, Senior District Judge for the Eastern District of Missouri, sitting by designation, who retired June 30, 1992. Judge Hungate, at conference, concurred in the result and reasoning of the court's opinion.

[1] The individual defendants associated with the City of Little Rock are Jim Dailey, Cyril Hollingsworth, John Lewellen, Sharon Priest, Hampton Roy, Lottie Shackleford, and Tom Dalton.

[2] The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas.

[3] The Army Corps of Engineers and its Colonel, Charles C. McCloskey, are parties defendant to the injunction and appealed it, though they have since dismissed their appeal. The Audubon Society and the individual plaintiffs moved to dismiss the appeal as moot. We took the motion with the cases, and now deny it without discussion, since there is obviously still an injunction running against the City of Little Rock.

had ignored the considerable effect increased traffic resulting from the bridge and its connected project would have on recreational use of Murray Park, Rebsamen Park, and other recreational areas on the south bank of the Arkansas River at Little Rock. The City argues that the Corps considered the effect of the traffic and that this court has no power to require the Corps to do anything further. Alternatively, the City requests that this court remand the matter to the Corps instead of affirming the order requiring an EIS. We affirm the judgment of the district court.

In 1987 the voters of Little Rock approved a capital improvement bond issue to build streets. At the time of the bond election, the city's list of top twenty street projects included an extension of Rebsamen Park Road permitting access to Murray Lock and Dam and Murray, LaHarpe View and Rebsamen parks from the west, where previously the only entrance had been from central Little Rock. These parks run alongside the Arkansas River near downtown Little Rock. The City has plans eventually to connect these parks to others in a "chain of parks." After the election, the City submitted an application to the Corps for a permit to put fill in along Jimerson Creek, a tributary of the Arkansas River, which would have to be bridged as part of the road extension. It was necessary to apply for a permit because of section 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403 (1988), and section 404 of the Clean Water Act, 33 U.S.C. § 1344 (1988). Under the National Environmental Policy Act (NEPA), federal agencies must prepare an EIS before approving "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (1988). The Corps determined that, though the only action affecting national waters was the placement of the fill in Jimerson Creek, NEPA required the Corps to consider the environmental impact on the entire area of "the proposed road extension plus the existing Rebsamen Park Road from gateway to gateway."

In connection with its review, the Corps gave notice to various state and federal agencies. In response to the notice, the Arkansas Department of Parks and Tourism identified as a potential problem the effect of increased traffic on recreational use of the Parks. The Department gave *conditional* approval to the project:

> The Department of Parks and Tourism will support the referenced project if the project's applicant, the City of Little Rock, makes every effort to ensure the safety and enjoyment of the users of this recreational area.... This Department recommends speed limits along the length of Rebsamen Park Road be set at no greater than 35 mph and reduced to 20 mph through the activity areas. Much of the danger introduced from this road extension would result from high speed traffic. As the plans are currently proposed, bicycles and pedestrians will be exposed to incredible risks if cars are passing at high speeds.

Joint Appendix at 360.

The Corps also gave public notice of the permit application, and received 64 public responses, 12 in support of the proposed road, 49 opposed to it, and 3 not expressing an opinion. The principal concern stated in the public responses was that the new road would be used as a commuter route from West Little Rock to downtown and spoil recreational use of the areas though which it passed. The Corps sent a letter to Little Rock's mayor, asking that the City provide traffic volume statistics for the road as it existed before the proposed extension and for the road with the proposed extension. The Corps also asked for average travel times from western Little Rock to downtown on the proposed Rebsamen Park Road compared with travel times for the same trip on the existing parallel route, Cantrell Road.

The Mayor responded that traffic on the existing Rebsamen Park Road was about 2,500 vehicles per day (vpd) on the weekend and 2,900 vpd on week days. The City estimated travel times from west Little Rock to downtown at 12.5 to 15 minutes on Cantrell Road and 13 minutes "or greater" on the proposed Rebsamen Park Road. If the City maintained a posted 35 mph speed

limit on the proposed Rebsamen Park road, the City projected traffic volume on the road at 4500 vpd shortly after completion. The City projected traffic volume in the year 2010 as 19,000 to 30,000 on Cantrell Road and 8,600 to 9,000 on the proposed Rebsamen Park Road if the speed limit were 35 mph. If the speed limit on Rebsamen Park Road were 45 mph, the prediction for 2,010 would be 15,000 vpd or greater.

The Corps then hired Peters & Associates, consulting engineers, to study the effect of the road extension. Peters issued a report concluding that the traffic volumes anticipated by the City would include commuter traffic and would pose a threat to the recreational use of the areas along the Arkansas River. The report stated:

> Traffic volumes increasing to only 4,500 vpd and compliance with a 35 MPH speed limit would be tolerable on the roadway as planned.... The Pulaski Area Transportation Study (PATS) has made volume projections for this section of Rebsamen Park Road to be between 8,600 and 9,000 vpd. If volumes of this magnitude materialize, it will most likely be a result of increased thru traffic use not a greater than three-fold increase in use of recreation facilities.... As a two-lane road the facility can accommodate, from a capacity standpoint, traffic volumes of the magnitude projected by PATS, but likely not without adverse impact on the recreational uses it is intended to serve. Although the route may not attract much thru traffic initially, as traffic volumes increase and congestion worsens on arterials and expressways, motorists will seek what they perceive as more attractive alternate routes, such as Rebsamen Park Road, even though travel times may not be significantly different. I believe this will eventually occur, probably over a five to six year period after completion, and volumes could easily grow to 8,000 to 9,000 vpd as projected by PATS.

Joint Appendix at 391. Peters made some remedial suggestions, including providing separate bridges over Jimerson Creek for autos, on the one hand, and bicycles and pedestrians, on the other; and "curvilinear alignment" and use of stop signs on Rebsamen Park Road.

The City responded to the Peters report by asking the Arkansas Highway and Transportation Department to project traffic volumes for the proposed road. The Department came up with a figure for the year 2010 of 5,384 to 9,265 vpd depending on the respective speeds at which traffic could travel on Rebsamen Park Road and Cantrell Road. (Traffic volume on Rebsamen Park Road would increase in response to a higher speed limit on Rebsamen Park Road and a lower speed limit on Cantrell Road.) The City rejected the Peters proposal for a separate bridge for pedestrians and cyclists and the inclusion of sharp curves and stop signs in the road to slow down traffic. The City proposed "one mild curve near the [Murray Lock and Dam] to reduce through traffic." Joint Appendix at 414.

Another response to the Corps' public notice came from the Corps' own resident engineer, who recommended against the road because it would bring in commuter traffic, posing a security threat to Murray Lock and Dam and creating traffic control problems.

Because of the unresolved opposition to the City's plans, the Corps held a public hearing on the permit application to enable the Corps to determine whether an EIS would be necessary.

At the public hearing those who spoke in favor of the proposed road were primarily people from nearby neighborhoods who saw the proposal as a way to relieve their own streets of excessive traffic. These citizens referred to the residential streets near the park as "freeway[s]". One said the "traffic is insufferable." Many citizens who identified themselves as park users opposed the road extension on the grounds that it would introduce commuter traffic into the parks and ruin the recreational value of the area. They stated that they currently used the area for jogging, bicycling, bird watching, walking and nature observation. Several stated that even on the existing road the City did not enforce

the posted 45 mph speed limit and motorists drove as fast as 60 mph.

Corps personnel's first draft of its Environmental Assessment[4] made several new points regarding the traffic situation. First, the draft stated that since the commute time to downtown would be about the same for the proposed road and Cantrell Road and since Cantrell Road had numerous stoplights, it was probable that many commuters would use the proposed road instead of Cantrell Road. Second, the draft stated that 7,550 vpd was the absolute limit of traffic volume before people would be unable to get on and off the proposed road safely. Moreover, short of the 7,550 number, many people would consider it unsafe to turn on to the road from the parks at some lesser volume and quit using the parks. The Peters report estimated that traffic would reach this volume within five years of completing the road, and the Corps personnel preparing the first draft wrote that a linear interpolation of the PATS study would predict such a volume within seven to eight years of completion. The City's design volume for the road was 8,000 vpd with a 35 mph speed limit. The first draft stated:

> The city considers Rebsamen Park Road to be a collector street and in their Master Street Plan, the design standards indicate a service traffic volume of 5,000 AVPD with a 36–foot pavement width for collectors. With the proposed 22–foot paved roadway for the Rebsamen Park Road extension and the design traffic volume of 8,000 AVPD, the proposed road will exceed their collector design standards in both these categories shortly after opening the road. The result will be those using the road including the recreational users will start to feel unsafe and some will stop using the recreational facilities along the road.... [T]he recreation benefits will start decreasing shortly after the road opens and continue to decrease as the through traffic continues to increase. By the year 2010, the through traffic component by itself would have increased to where access to or exit from the recreation facilities would not be possible during peak commute periods, thus severely impacting recreational benefits.

Joint Appendix at 642.

The first draft imposes numerous special conditions on the City to obtain the permit, including posting and strictly enforcing a 25 mph speed limit and monitoring traffic so that if through traffic exceeds 1,000 vpd, the City would have to close the road during rush hour.

The second draft of the Environmental Assessment concluded: "After weighing the benefits ... I have concluded that the adverse impacts of the project on recreation and other users [sic] outweigh the benefits of the proposed project and that the roadway would be contrary to the public interest." Joint Appendix at 686.

The third and final draft of the Environmental Assessment, however, concluded that the proposed road would have "no significant impact on the quality of the human environment" and therefore finds no need to prepare an EIS. The special conditions from the first draft concerning speed limit, traffic measurement and closing the road at rush hour are absent. No explanation is articulated for this change in position. The Corps' Colonel McCloskey adopted the third draft and issued the permit to place the fill in Jimerson Creek.

The Audubon Society and several individuals[5] (for convenience' sake we will refer to the plaintiffs collectively as the Audubon Society) sued the City and the Corps to enjoin the project and later amended the complaint to join the contractor the City had hired to build the project. The district court granted a temporary restraining order, enjoining construction of the Jimerson Creek bridge. The parties agreed to submit the case to the court on cross motions for summary judgment.

---

4. In an "Environmental Assessment," an agency sets out its evidence and analysis for determining whether an EIS is necessary. 40 C.F.R. § 1508.9 (1991).

5. The individual plaintiffs are Alice B. Andrews, David F. Gruenewald, Barry H. Haas, and Robert H. McKinney.

The district court reviewed the Corps' decision that an EIS was not necessary under the "arbitrary or capricious" standard of review, looking to see " 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Audubon Society v. Dailey*, 761 F.Supp. 640, 649 (E.D.Ark.1991) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). The district court concluded that the administrative record showed the traffic problem resulting from the project would "significantly affect the quality of the human environment," [6] thereby triggering the requirement that the Corps prepare an EIS. *Id.* at 650.

> While the COE [Corps of Engineers] might have been taking a "hard look," the COE ultimately chose to ignore what it saw. All the facts and scientific projections showed the tremendous increase in traffic that will occur severely impacting the recreational uses of the area. The City's wishful thinking that the commuting public will choose Cantrell with its approximately eight more stoplights for the comparable distance and travel time over Rebsamen Park Road is without justification. The COE's misplaced reliance on the City's empty assurances that it will enforce the 35 mph speed limit flies in the face of the COE's information that the current limits are not being enforced and the public will use a speed limit 10 mph over the existing limits. The COE was not relying on reasonable opinions of any qualified experts in concluding the impacts of the project were not significant when its own consultant and personnel had made reasoned decisions to the contrary based on their evaluations of the available data.

.    .    .    .    .

The Court must conclude that the COE's decision that the impacts of the project lack significance on the quality of the human environment and the permit should issue is not founded on a reasoned evaluation "of the relevant factors" and that the COE's decision to not prepare an EIS was a "clear error of judgment." *Id.* at 649–50. The court entered an order suspending the grant of the permit and enjoining construction until an EIS has been completed. *Id.*

## I.

■■■ At the threshold we must determine the standard governing our review of the Corps' decision [7] that the project would "not significantly affect the quality of the human environment." The City argues that in applying the "arbitrary and capricious" standard as prescribed in *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), and *Goos v. ICC*, 911 F.2d 1283, 1292 (8th Cir.1990), we must look only to see whether the Corps gathered information on the relevant subjects, not whether the Corps' decision was consistent with the information so gathered. The Audubon Society, on the other hand, argues that we should apply a de novo standard.

The City argues that NEPA is entirely procedural and that a reviewing court's only role is to ascertain that the agency in question took certain procedural steps at each juncture in approving an action. The City cites *Missouri Coalition for the Environment v. Corps of Engineers*, 866 F.2d 1025 (8th Cir.), *cert. denied*, 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 42 (1989), arguing that Audubon must show the administrative record omitted "facts ... which, if true, would show that the permitted project could have a substantial impact on the environment." 866 F.2d at 1032. We are not sure how much of *Missouri Coalition* has

---

**6.** The parties do not dispute that the other component determining the need for an EIS, "major federal action," exists in this case.

**7.** We are, of course, also reviewing the decision of the district court. Since the district court granted summary judgment, our review of its

decision is plenary. *Sabine River Auth. v. United States Dept. of Int.*, 951 F.2d 669, 679 (5th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 75, 121 L.Ed.2d 40 (1992). *See also Lockhart v. Kenops*, 927 F.2d 1028, 1032 (8th Cir.), *cert. denied*, 116 U.S. 761, 112 S.Ct. 186, 116 L.Ed.2d 148 (1991).

survived *Marsh.* See our discussion in *Goos*, 911 F.2d at 1291–92. Further, we do not read *Missouri Coalition* as restrictively as the City would argue. Though language in *Missouri Coalition* seems to refer to omission of facts from the record as the only sort of error justifying reversal of an agency, actually it is only one of several ways in which the agency's determination can be flawed.

The District of Columbia Circuit has listed four factors to be considered in determining whether an agency's decision to forego an EIS is arbitrary and capricious:

(1) whether the agency took a 'hard look' at the problem;

(2) whether the agency identified the relevant areas of environmental concern;

(3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and

(4) if there was impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 681–82 (D.C.Cir.1982); *Sierra Club v. United States Dept. of Transp.*, 753 F.2d 120, 127 (D.C.Cir.1985).[8] While the City would limit our inquiry to the second factor in *Cabinet Mountains*, the district court's determination properly focussed on the third factor—whether the conclusion of insignificant impact is sufficiently convincing.

Though the formulation of the standard of review is more general, it is also clear from the language in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), that we are not limited (as the City would have it) to determining whether the agency considered the "relevant factors." Under *Overton Park*, we must also reverse if there has been a "clear error of judgment". *Id.* Under this standard, the court has the responsibility to verify that the agency's conclusion follows from the premises the agency relies on.

We therefore conclude that the district court correctly understood its role in conducting review under the "arbitrary and capricious" standard.

The Audubon Society, on the other hand, argues that this case should not be reviewed under the "arbitrary and capricious" standard, but instead under the de novo standard. The Society relies on language from *Marsh v. Oregon Natural Resources Council*, in which the Court remarked that the arbitrary and capricious standard governed the case before it, but distinguished its case ("this dispute involves primarily issues of fact") from one that "turn[ed] on the meaning of the term 'significant' or on an application of this legal standard to settled facts." 490 U.S. at 377, 109 S.Ct. at 1860.

Though *Marsh* leaves open the possibility that some questions arising under NEPA may be reviewed under a different standard, the agency's determination in this case involves mixed questions of fact and law: for instance, determining the traffic volume that would so interfere with use of the land adjacent to Rebsamen Park Road to constitute a "significant" impact. Our circuit and others have reviewed agency treatment of such questions under the deferential arbitrary and capricious standard. *See, e.g., Lockhart v. Kenops*, 927 F.2d at 1033–34; *State of North Carolina v. Federal Aviation Administration*, 957 F.2d 1125, 1133 (4th Cir.1992); *Sierra Club*

---

**8.** The *Cabinet Mountains* catalog of factors for deciding when a decision to forego an EIS is arbitrary and capricious corresponds roughly with the checklist for "arbitrary and capricious" review of agency rulemaking:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). *See generally*, Steven Childress & Martha Davis, *Federal Standards of Review* § 15.07 (2d ed. 1991).

*v. United States Dep't of Transp.*, 753 F.2d at 126–29 (interpreting the impact of a given condition is left to the judgment of the agency); *see generally*, Childress and Davis, § 15.07 at p. 15–40.

### II.

■ The next question before us, then, is whether the Corps' decision that the road extension would not significantly affect the human environment was arbitrary and capricious. This question we break into two subquestions: (1) does the Environmental Assessment make a convincing case that the impact of the permit as issued will be insignificant, and (2) is the City's post judgment offer to be bound by certain mitigating conditions adequate to cure any defect in the permit as issued?

There seems to be no dispute that if the road extension were made available without special regulation of its use, the effect would be a large increase in traffic through the area and a significant impact on the quality of the human environment.[9] The Corps acknowledged this problem in its Environmental Assessment:

> An expected large increase in traffic through the area, especially through traffic, could adversely affect recreational uses in the parks by interfering with ingress and egress. Ultimately, control of traffic speed and volumes through the area is the responsibility of local officials, not the federal government. Accordingly, it is expected that City of Little Rock officials will take whatever traffic control measures are appropriate and necessary to control traffic speeds and volumes and provide safe recreational opportunities for all.

> .    .    .    .    .

While there are potential adverse impacts to the project, particularly a de-

graded recreation experience due to increased traffic, due diligence by the applicant, the city of Little Rock, in the normal execution of its duties should minimize these impacts.

Joint Appendix at 704; 708.

The troublesome question then is adequacy of mitigating measures to keep the impact below the level of significance.

The permit as issued contains as special conditions neither a speed limit, nor any requirement of speed limit enforcement, nor any provision for closing the road off at rush hours. The Environmental Assessment stated that the City agreed to establish and enforce a 35 mph speed limit, but it did not make this a condition of the permit. Other mitigation measures included the City's agreement to place gateways with stop signs at the west entrance to the parkway and the east entrance to Rebsamen Park, and inclusion of a "mild" curve in the road design. With a speed limit of 35 mph the Peters report indicated traffic volume on the road would be 8,000 to 9,000 autos per day by 1995. Even the City estimated that volumes would reach this level by 2010. There was abundant evidence that the City is not able to enforce its 45 mph speed limit on the road as it exists and that traffic moves as fast as 60 miles per hour on Rebsamen Park Road now.

Thus, the Environmental Assessment itself comes very close to explicitly acknowledging that without enforcement of the 35 mph speed limit the project would have significant impact on the environment, yet the administrative record shows that the entity responsible for enforcing the speed limit has not enforced it on the existing road.

■ An agency may certainly base its decision of "no significant impact" on miti-

---

**9.** We determine the meaning of "significantly" in 42 U.S.C. § 4332 by reference to regulations of the Council on Environmental Quality, 40 C.F.R. § 1508.27 (1991). Under the regulations we consider both the context and intensity of an effect to decide if it is "significant." Intensity is evaluated by reference to (inter alia):

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to ... park lands....

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial....

40 C.F.R. § 1508.27.

gating measures to be undertaken by a third party. *See Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 987 (9th Cir.1985). In such a case, the mitigating measures need not be a condition of the permit (although this helps, *see State of Louisiana v. Lee,* 758 F.2d 1081, 1083 (5th Cir.1985), *cert. denied,* 475 U.S. 1044, 106 S.Ct. 1259, 89 L.Ed.2d 570 (1986)), nor even a contractual obligation, *see Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851 (9th Cir.1982). However, the mitigating measures must be "more than mere vague statements of good intentions." *Id.* at 860–61; *Lee,* 758 F.2d at 1083. Of course, the result of the mitigating measures must be to render the net effect of the modified project on the quality of the environment less than "significant." *See Cabinet Mountains,* 685 F.2d at 682.

In this case, the evidence from the public hearing gave every reason to doubt that the City would or could enforce the speed limit. Moreover, the Corps' lawyer made clear at argument before the district court that under the permit as issued, enforcement of the limit is left entirely to the City.

Furthermore, even at the 35 mph limit, the Corps' first draft of the Environmental Assessment indicates that an 8,000 to 9,000 vpd volume of traffic would have an adverse effect on park users, since the road would be so busy at 7,550 vpd that they would not be able to get on and off the road safely, and many would be discouraged from using recreational facilities at some point before that.

With this evidence, we have no hesitation in concluding that the district court did not err or abuse its discretion in concluding that the Corps acted arbitrarily when it said that the project would have no significant impact on the human environment. As the district court aptly observed, the Corps, while taking a hard look, chose to ignore what it saw.

Finally, the City argues that in lieu of affirming the district court's judgment, we should order the district court to remand to the agency or the district court for further deliberations on the necessity of an EIS. In a Rule 60(b) motion filed with the district court after it had taken this appeal, the City proposed that the Corps could issue a revised permit including four special conditions which would be "part of the permit and could be the basis for revocation of the permit if they are not followed":

> The City shall develop a traffic monitoring and measuring plan for Rebsamen Park Road between the gateways and submit the plan to the District Engineer within three months of the permit issuance period.... If traffic measurements indicate that the thru traffic component on Rebsamen Park Road exceeds 325 average vehicles per hour during the hours of 7:00 to 9:00 a.m. and 4:30 to 6:30 p.m., the city shall take appropriate measures to reduce the number below 325 thru vehicles per hour....

> The City shall post and strictly enforce a 35 mph speed limit on Rebsamen Park Road between the gateways....

> The City shall place stop signs for entering and exiting at both the eastern and western gateways of the project....

> If the City fails to implement or comply with any of the special conditions of this permit or if there is a pattern of non-enforcement of any of the conditions by the City, the Little Rock District Corps of Engineers may take appropriate measures to assure compliance or may take appropriate measures to revoke or suspend this permit and require removal or permanent closure of the Jimmerson Creek Bridge.

Joint Appendix at 297. The City suggests that we remand to the district court for consideration of the Rule 60(b) motion. In the same vein, the City argues that even if we declare the permit as issued fails to comply with NEPA, the court should remand to the Corps for further deliberation on the necessity of an EIS, rather than directly requiring one.

Of course, the Rule 60(b) motion is neither addressed to us, nor affects our jurisdiction, *Taumby v. United States,* 919 F.2d 69, 72 (8th Cir.1990). The district court has jurisdiction over the motion and the responsibility to decide it. On the record before us, and with only the order of the district

court before us to review, we conclude that the judgment of the district court requiring an EIS was not in error.

## III.

The Audubon Society makes a number of other attacks on the Corps' decision to issue the permit. In light of our holding that the Corps cannot issue the permit without an EIS, it is not necessary for us to deal with these additional arguments.

We affirm the judgment of the district court.

