**PRESERVE ENDANGERED AREAS OF COBB'S HISTORY, INC. ("P.E.A.C.H."); Roger Peaster; Heidi Peaster; Johnny Plunkett; Ruby Plunkett; John Mowell; and, Marie Mowell**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS; Togo D. West, Secretary of the Army; Colonel Wayne M. Boy, District Engineer, Savannah District Corps of Engineers; Necholous Ogden, Chief Regulatory Branch, Savannah District Corps of Engineers; United States Environmental Protection Agency; Carol M. Browner, Administrator; John H. Hankinson; Regional Administrator; and, Cobb County, Georgia.**

Civil No. 1:95–CV–1394–WCO.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 20, 1995.

Robert B. Remar, Susan Marie Garrett, Kirwan Parks Chesin & Remar, Atlanta, GA, for Preserve Endangered Areas of Cobb's History, Inc., Roger Peaster, Heidi Peaster, Johnny Plunkett, Ruby Plunkett, John Mowell, Marie Mowell.

Patricia Rebecca Stout, Office of United States Attorney, Northern District of Georgia, Atlanta, GA, Mark A. Brown, U.S. Department of Justice, Environment & Natural Resources Division, Wildlife & Marine Resources Section, Washington, DC, Naikang Tsao, U.S. Department of Justice, Environment & Natural Resources Division, Environmental Defense Section, Washington, DC, Caroline M. Zander, U.S. Department of Justice, Environmental/Natural Resources Division, General Litigation Section, Washington, DC, Rebecca R. Phillips, U.S. Army Corp of Engineers, Office of Counsel, Savannah, GA, for United States Army Corps of Engineers, Wayne M. Boy, Necholus Ogden.

Patricia Rebecca Stout, Office of United States Attorney, Atlanta, GA, Mark A. Brown, U.S. Department of Justice, Environment & Natural Resources Division,

**1560**

Wildlife & Marine Resources Section, Washington, DC, Naikang Tsao, U.S. Department of Justice, Environment & Natural Resources Division, Environmental Defense Section, Washington, DC, Caroline M. Zander, U.S. Department of Justice, Environmental/Natural Resources Division, General Litigation Section, Washington, DC, Togo D. West, United States Environmental Protection Agency, Carol M. Browner, John H. Hankinson.

Fred Douglas Bentley, Jr., Coleen Daugherty Hosack, Bentley Bentley & Bentley, Marietta, GA, Fred Douglas Bentley, Jr., Office of Cobb County Attorney, Law Department, Marietta, GA, for Cobb County, Georgia.

Roy E. Barnes, Jerry A. Landers, Jr., Barnes Browning Tanksley & Casurella, Marietta, GA, for C.W. Matthews Contracting Company, Inc.

*ORDER*

O'KELLEY, District Judge.

The captioned case is before the court for consideration of various motions:

1. Plaintiffs' motion for reconsideration [42–1];
2. Plaintiffs' motion for summary judgment [46–1];
3. Defendant Cobb County's motion for summary judgment [47–1];
4. Federal defendants' motion for summary judgment [50–1];
5. Plaintiffs' motion to supplement the record [52–1];
6. Defendant Cobb County's motion to strike [56–1]; and,
7. Federal defendants' motion to strike [57–1].

Each motion will be considered in turn or, if the matter warrants, considered collectively with related motions.

**1. Plaintiffs' motion for reconsideration [42–1]**

Plaintiffs' motion seeks reconsideration of that portion of this court's order dated August 24, 1995, wherein certain claims brought pursuant to the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(2), were dismissed, along with a claim challenging the Environmental Protection Agency ("EPA") administrator's failure to exercise oversight authority.

■ The Local Rule governing motions for reconsideration states:

> Motions for reconsideration **shall not be filed as a matter of routine practice.** Whenever a party or attorney believes it is **absolutely necessary** to file a motion to reconsider ... [it] shall be filed with the Clerk of the Court within 10 days after the entry of the order or judgment. ...

LR 220–6, NDGa. (emphasis added). As indicated by the language of the aforementioned local rule, motions for reconsideration are not to be filed as a matter of course. In fact, the term "motion for reconsideration", as such, does not appear in the Federal Rules of Civil Procedure. The title of FED. R.CIV.P. 60(b), under which a so-called motion for reconsideration may be brought, further attests to its extraordinary nature ("Relief From Judgment or Order—Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc."). "[Rule 60(b) ] is 'properly invoked where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship'...." *Mohammed v. Sullivan,* 866 F.2d 258, 260 (8th Cir.1989) (*quoting Matarese v. LeFevre,* 801 F.2d 98, 106 (2d Cir. 1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987)). A motion for reconsideration is not an opportunity for the moving party and their counsel to instruct the court on how the court "could have done it better" the first time. Rather, the motion should be reserved for certain limited situations, namely the discovery of new evidence, an intervening development or change in the controlling law, or the need to correct a clear error or prevent a manifest injustice. *See, e.g., Kern–Tulare Water District v. City of Bakersfield,* 634 F.Supp. 656, 665 (E.D.Cal 1986), *aff'd. in part and rev'd. in part,* 828 F.2d 514 (9th Cir.1987), *cert. denied,* 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988).

■ Plaintiffs' pending motion does not meet this onerous standard. The court has no doubt that this motion was filed in good faith. Nevertheless, plaintiffs are unable to articulate a persuasive reason for the court

to depart from its prior ruling. Until presented with binding precedential authority to the contrary, the court will not depart from the manner of statutory construction articulated in the August 24 order. In terms of the *Kern–Tulare* analysis set forth above, plaintiffs do not introduce any new evidence, nor have they apprised the court of any intervening legal developments which challenge the propriety of the original ruling. Lastly, there is little risk of manifest injustice, inasmuch as a number of plaintiffs' claims are unaffected by the underlying order, so there remains ample opportunity to address plaintiffs' fundamental complaint, namely the issuance of the § 404 permit. Thus, plaintiffs' motion for reconsideration is hereby DENIED.

**2. Plaintiffs' motion for summary judgment [46–1]**

Plaintiffs' motion for summary judgment is hereby DENIED because it fails to establish that plaintiffs are entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c).

**3–4. Defendant Cobb County's motion for summary judgment [47–1] and Federal defendants' motion for summary judgment [50–1]**

*FACTS*

This action was commenced as a challenge to a proposed highway construction project in Cobb County, Georgia. Plaintiffs allege violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4332 *et seq.*, the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, and the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470f. The scope of this lawsuit was narrowed considerably by an order dated August 24, 1995, wherein the court dismissed a number of plaintiffs' claims. The court further ordered the parties to submit cross-motions for summary judgment to facilitate resolution of the ulti-mate question in the case at bar. Inasmuch as *all* defendants share a common interest in the ultimate outcome of this matter, the court will consider the two motions for summary judgment collectively.

Notwithstanding the variety of claims asserted by plaintiffs, the fundamental issue before the court, as to both the plaintiffs' and defendants' motions, is whether the Army Corps of Engineers' ("Corps") Finding of No Significant Impact ("FONSI") and issuance of a § 404 permit for the construction of Phase IV of the East–West Connector was, in light of the applicable legal standard, erroneous as a matter of law. If the foregoing question is answered affirmatively, the case must be remanded to the Corps for reconsideration consistent with this court's order. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978). If, on the other hand, the foregoing question is answered negatively, the Corps' determination must stand as rendered.

Typically, at this juncture, the court would set forth a concise finding of facts upon which the motion for summary judgment could be evaluated. However, due to the voluminous record of facts before the court, i.e. the administrative record, the interests of efficiency and judicial economy will be best served by the interjection of facts, as necessary, throughout the following legal discussion.

In terms of the source of the facts under consideration, it is important to recognize that the court has had the opportunity to visit this issue on a previous occasion in the case *sub judice.* In the court's order dated August 24, 1995, the court determined, upon reconsideration of a prior order, that judicial review in this case should be confined to the administrative record, unless certain circumstances exist which would warrant departure from that record.[1] With that background,

---

1. Those circumstances include insufficient support in the record for the action taken, a material deficiency in the record, a failure to consider certain factors in compiling the record, and/or a suggestion of bad faith or dereliction of duty in preparing the record. Order of August 24 at 11.

As noted in that order, " 'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.' " *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 730, 743, 105 S.Ct. 1598, 1600, 1606, 84 L.Ed.2d 643

the court may now proceed to evaluate the legal merits of the pending motion.

## LEGAL ANALYSIS

### I. *The Summary Judgment Standard*

Summary judgment is only proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). "Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Because summary judgment deprives the parties of a trial on the issues, the court must ensure that only those claims for which there is no actual dispute as to material fact are disposed of by this procedural device. *Id.*

It is well established that in evaluating a summary judgment motion, the court must view the evidence in the light most favorable to the non-movant. *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988); *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir.1986), *reh'g. denied*, 815 F.2d 66 (11th Cir.1987). Accordingly, to survive a motion for summary judgment, the non-moving party need only present evidence from which the trier of fact might return a verdict in his favor. *Samples*, 846 F.2d at 1330. That notwithstanding, Rule 56, "[b]y its very terms, ... provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–8, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original). The materiality of the facts is governed by the substantive law in the case under consideration. *Id.* at 248, A dispute is genuine if the evidence is such that (1985) (*quoting Camp v. Pitts*, 411 U.S. 138, 142

the factual issues "may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511.

### II. *The APA Standard of Review*

As noted above, in terms of ascertaining the material facts relevant to the adjudication of this motion, consistent with the Administrative Procedure Act ("APA"), the court is limited to the confines of the administrative record. 5 U.S.C. § 702. Moreover, the APA is the source of the legal standard which the court must employ in evaluating the facts contained in the record. The APA provides that "[t]he reviewing court shall ... hold unlawful and set aside any agency action, findings, and conclusions found to be ... *arbitrary, capricious, an abuse of discretion*, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A).

This standard erects a significant barrier before a litigant who endeavors to challenge an administrative action. The Supreme Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer...." *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (citations omitted). If the decision reached by the administrating agency " 'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by statute, we should not disturb it unless it appears that the accommodation is not one that Congress would have sanctioned.' " *Id.* (*quoting United States v. Shimer*, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

In applying this standard, courts generally look to " 'whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions approved by the administrative body.' " *Mobil Oil v. Department of Energy*, 610 F.2d 796, 801 (Temp. Emer.Ct.App.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (1973)).

(*quoting Texaco, Inc. v. FEA,* 531 F.2d 1071, 1076–77 (Emer.Ct.App.1976), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976)). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). *See also Baltimore Gas & Electric Co. v. NRDC,* 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983). This court will not "lightly set aside agency action based on the exercise of [the agency's] accumulated expertise merely because, were we trying the matter anew, we might reach a different result." *Simeon Management Corp. v. FTC,* 579 F.2d 1137, 1142 (9th Cir.1978). *See also Chevron, supra,* at 844 n. 14, 104 S.Ct. at 2782 n. 14 ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."). In sum, "[t]he arbitrary and capricious standard is highly deferential to the agency and presumes the agency's action is valid. . . . It forbids the court from substituting its own judgment for that of the agency. . . . The court is bound to affirm the agency's decision if the agency presents a rational basis for substantiating its action. . . . The agency action should *only* be reversed if the error is so clear as to deprive the agency's decision of a rational basis." *Rodriguez v. Panasiuk,* 844 F.Supp. 1033, 1036 (E.D.Pa.1994) (citations omitted) (emphasis added).

Having set forth the applicable legal standard, the court can now proceed to apply it to the Corps' decision to issue a § 404 permit without the preparation of an Environmental Impact Statement ("EIS"), with particular attention focused on the impacts on wetlands and historical areas surrounding the project, and with consideration as to whether the way in which the project was analyzed qualifies as an "unlawful segmentation." [2] Next, the court will decide whether the determination that the Endangered Species Act is not violated is arbitrary and capricious. Lastly, the court will examine certain issues involving the actual content of the administrative record.

Once again, before proceeding, it is imperative that the issue before the court be understood. The court must determine whether there are any material facts in dispute as to whether the Corps' decision was arbitrary and capricious as a matter of law. That is the only question for which this court has jurisdiction in the case *sub judice.*

### III. *The Decision Not to Prepare and EIS and to Issue the FONSI*

The first question which must be addressed is whether the Corps' conclusion that the project is not a "major federal action" was arbitrary and capricious. The reason for starting at this point is that if that decision is deemed arbitrary and capricious, i.e., there is no reasonable basis upon which one could conclude that the project is *not* a major federal action, then the preparation of an EIS is obligatory, and the action must be remanded. The compilation of an EIS for "major federal actions significantly affecting the quality of the human environment" is mandated by statute. 42 U.S.C. § 4332(2)(C)(i).

■ It is clear that, at a minimum, the involvement of the Corps in the permitting process renders the project a federal action. Regulations promulgated by the Council on Environmental Quality pursuant to NEPA state that a federal action includes, *inter alia,* the "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activity." 40 C.F.R. § 1508.18(b)(4). This interpretation has been sanctioned by the courts. *See, e.g., United States v. Southern Florida Water Management Dist.,* 28 F.3d 1563, 1573 (11th

---

**2.** This actually involves two distinct issues: whether the conclusion that an EIS was not needed was arbitrary and capricious, and whether the decision to issue the § 404 permit was arbitrary and capricious.

Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1956, 131 L.Ed.2d 848 (1995).

Next, the court must determine whether the federal action at issue in this case is a *major* federal action, thus triggering the requirement to prepare an EIS. The Council on Environmental Quality ("CEQ") has produced a fairly detailed body of regulations, which provide a paradigm in which to determine whether an action is within the scope of 42 U.S.C. § 4332(2)(C)(i). The CEQ has noted that, for purposes of statutory interpretation, "[m]ajor reinforces but does not have a meaning independent of significantly." 40 C.F.R. § 1508.18. To determine whether a project "significantly" impacts the environment, an agency must look to both the context of the project and the intensity of its effect. *Id.* At § 1508.27. The regulations elaborate further on the nature of the types of information an agency should consider in assessing the impact of a proposed project:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action effects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

40 C.F.R. § 1508.27.

■ Perhaps the most important word in the foregoing itemization of considerations, as evidenced by its repeated use, is "degree." This is so because NEPA effectively instructs the agency to perform a balancing test by weighing competing concerns to see whether, in the final analysis, going forward with a given project outweighs any potential or actual adverse consequences of that project. Thus, " '[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.' " *North Buckhead Civic Ass'n. v. Skinner,* 903 F.2d 1533, 1540 (11th Cir.1990) (citation omitted).

In the case at bar, the Corps concluded that the proposed project was not a major federal action. Based on that conclusion, the Corps, as permitted by 40 C.F.R. §§ 1501.4(a) and (e), issued a FONSI based on the Environmental Assessment ("EA"), and thereafter issued a § 404 permit. Therefore, the court must decide whether the conclusion that the proposed project was not a major federal action is arbitrary and capricious as a matter of law. In light of the nine criteria set forth above, especially those in paragraphs (3), (7) and (8), the court finds the determination was not arbitrary and capricious as a matter of law.

■ The administrative record indicates that the Corps did in fact consider the potential impact of the project on federally pro-

tected wetlands. The case document, in relevant part, provides:

> The proposed project would impact 3.8 acres of wetlands. The county will undertake a number of control measures to minimize the impacts to wetlands. Cobb County has purchased a tract of land to the north of Nickajack Creek for a proposed park. Cobb County submitted a revised wetland mitigation plan dated February 28, 1995. The plan identifies 19.7 acres of wetlands to be preserved within Cobb County landholdings. Cobb County also proposes to restore a minimum of 7.8 acres of previously cleared and drained floodplain/wetland area. This includes 3.8 acres of wetlands and 4.0 acres riparian forest. Restoration site is located just off Nickajack road.

Administrative Record ("AR"), Volume XI at Exhibit 98, Part C, ¶ 21. Based on the above information, the Corps was able to conclude that, at least in terms of wetlands, there would be no significant impact on the human environment.[3] Plaintiffs do not point to any deficiency in the AR which supports a contention that this conclusion was arbitrary and capricious. Plaintiffs belief that the decision is wrong and destructive to the environment, however fervent it may be, is simply insufficient to overcome the procedural hurdle set up by the APA. In addition, plaintiffs' reliance on *Audubon Society of Central Arkansas v. Dailey,* 761 F.Supp. 640 (E.D.Ark. 1991), *aff'd.,* 977 F.2d 428 (8th Cir.1992), is misplaced. Plaintiffs accurately note that the Corps decision that the wetlands effects of the proposed project did not categorize the project as a major federal action was, in large measure, premised on Cobb County's acquisition and restoration plans for wetlands sites. With respect to the consideration of mitigation plans, the *Audubon Society* court held:

> An agency may certainly base its decision of "No significant impact" on mitigating measures to be undertaken by a third party.... In such a case, the mitigating measures need not be a condition of the

permit ... nor even a contractual obligation.... However, the mitigating measure must be "more than mere statements of good intentions." ... Of course, the result of the mitigating measures must be to render the net effect of the modified project on the quality of the environment less than "significant."

977 F.2d at 436 (citations omitted). Relying on this statement, plaintiffs contend that because the proposed mitigation measures do not render the project's impact less than significant, the Corps did not have the right to issue a FONSI based on an EA. This argument is conclusory, and is not supported by facts in the AR. While plaintiffs do indicate serious differences of opinion, they do not show that the determination was arbitrary and capricious. In fact, based on the considerable documentation relating to wetlands acquisition and restoration, *see* AR, Volume XI at Exhibits 95, 96, 97, and 100, it is evident that this action was not arbitrary and capricious.

■ An examination of the AR compels the same conclusion vis-a-vis the issues surrounding the historic district. As with the wetlands question, the case document specifically addresses the expected impact on the historic district. AR, Volume XI at Exhibit 98, Part C ¶¶ 3, 5. The case document indicates that, in accordance with the NHPA, a mitigation plan must be proposed once an adverse impact is identified. *Id.* At ¶ 5. Such a plan, manifested in a Memorandum of Agreement ("MOA") among the Savannah District, Corps of Engineers, the Georgia State Historic Preservation Officer, the Advisory Council on Historic Preservation, and Cobb County, Georgia, was in fact executed in January, 1995. AR, Volume X at Exhibit 89. The case document takes note of the MOA, and states: "Stipulations included in the [MOA] would be carried out as conditions upon which the issuance of the permit to the County would be predicated. As part of the historic mitigation plan, historic structures would be stabilized if necessary prior to con-

---

3. A more detailed discussion of wetlands issues can be found elsewhere in the administrative record. AR, Volume XI at Exhibits 95, 96, 97, and 100. This further substantiates the finding that the Corps decision, irrespective of whether the court agrees with it, was not arbitrary and capricious.

struction activities occurring." AR, Volume XI at Exhibit 98, Part C ¶ 5. The preparation of the MOA among the aforementioned parties is consistent with the requirements of the NHPA, 16 U.S.C. § 470f. The participation of the Advisory Council through the use of an MOA has been judicially sanctioned as a means of compliance with § 470f. *National Center for Preservation Law v. Landrieu,* 496 F.Supp. 716, 741 (D.S.C.), *aff'd.,* 635 F.2d 324 (4th Cir.1980). Moreover, as noted in the federal defendants' brief, the MOA was preceded by a series of public meetings. Federal Defendants' Brief In Support of Motion for Summary Judgment at 9. Plaintiffs primary criticisms of the MOA is its alleged lack of specificity and its reliance on future development by the County. There are two problems with this line of argument. First, the MOA is not, as a matter of law, so lacking in detail or purpose, as to render the Corps' approval of it arbitrary and capricious. In fact, it sets forth a fairly specific series of obligations which Cobb County must undertake regarding development and preservation of impacted historical areas. Second, and more importantly, the MOA is expressly incorporated in the § 404 permit issued by the Corps. AR, Volume XI at Exhibit 99. Page 3 of the permit sets forth the following special condition: "That the work shall be accomplished in accordance with approved project plans, including the *Memorandum of Agreement on Historic Preservation,* the wetland mitigation plan, drawings, and the Georgia Water Quality Certification." *Id.* (Emphasis added). Thus, any failure by Cobb County to comply with the terms of the MOA allows the Corps to commence a civil enforcement action. 33 C.F.R. §§ 326.4–.5. This fact adds significant force to the MOA, and strongly militates against an argument that the Corps' decision relating to the historical sites was arbitrary and capricious.

■ A third issue which plaintiffs rely on in support of the argument that the Corps acted in an arbitrary and capricious manner, involves the issue of segmentation. Plain-

tiffs' complaint alleges that defendants unlawfully avoided the NEPA requirements to prepare an EIS for all major federal actions, by viewing the project in isolation, and not as part of an integrated road and highway system in Cobb County. The possibility of such segmentation is contemplated by the CEQ regulations discussed earlier. "Significance exists if it is reasonable to anticipate accumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or breaking it down into small component parts." 40 C.F.R. § 1508.27(7). This regulation anticipates that the need for an EIS might be obviated if a project is divided into components, each of which, standing alone, has effects on the human environment which can be deemed less than significant. Accordingly, "[a]gencies may not evade their responsibilities under NEPA by artificially dividing a major federal action into smaller components, each without a 'significant' impact." *Coalition on Sensible Transportation, Inc. v. Dole,* 826 F.2d 60, 68 (D.C.Cir.1987). *See also Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 439 (5th Cir.1981).[4] In evaluating a road development proposal, Federal Highway Administration regulations require the preparation of an EIS *or* a FONSI if the project meets three criteria:

(1) Connects *logical termini* and is of sufficient length to address environmental matters on a broad scope;

(2) Has *independent utility* or independent significance, i.e., is useable and a reasonable expenditure even if no additional transportation improvements in the area are accomplished; and

(3) Will not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 C.F.R. § 771.111(f) (emphasis added). Criteria based on these have been used by courts in evaluating claims of unlawful segmentation. *See, e.g., Coalition on Sensible Transportation, supra,* at 68; *Piedmont Heights, supra,* 439. These three factors,

---

4. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

however, have not always been afforded equal weight.

> [I]n the context of a highway within a single metropolitan area—as opposed to projects joining major cities—the "logical terminus" criterion is unusually elusive. Thus we join the court in *Piedmont Heights Civic Club*, 637 F.2d at 440, in assigning it modest weight and focussing more on "independent utility."

*Coalition on Sensible Transportation, supra,* at 69.

■ In terms of the APA legal standard, the question before the court is whether there is any basis in the AR from which it can be determined, as a matter of law, that there is a genuine issue of material fact as to whether the Corps' decision as to segmentation was arbitrary and capricious. That question compels an analysis of the conclusion as to the independent utility of Phase IV of the East–West Connector. It is important to reiterate that the court's mission is to look at the information which was before the Corps' and determine whether, in light of such information, the decision was arbitrary and capricious. The mission does not encompass a *de novo* review of the merits of the decision. It is undisputed that Cobb County has experienced significant population growth, which has proved taxing on its surface roads, and necessitated the need for some mode of improved transportation. Federal Defendants' Brief In Support of Motion for Summary Judgment at 16–18. That notwithstanding, the demographic needs of a permit applicant do not foreclose compliance with applicable law. Therefore, the Corps, prompted by a position paper submitted by plaintiffs, required Cobb County to address specific written questions in an effort to assure NEPA compliance. Of particular import, Cobb County was required to defend the position that Phase IV of the East–West Connector had independent utility. The response to these questions, supported by over 50 exhibits, is part of the administrative record. AR, Volume XII. Of particular relevance to the issue before the court, Cobb County, responding to the Corps' NEPA questions, stated that the East–West Connector has an independent utility, irrespec-

tive of whether it ultimately ties in to other projects. AR, Volume XII at 9 ¶ (a). The County also noted that the existing phases (I–III) were already carrying approximately 25,000 vehicles per day. *Id.* The independent utility of Phase IV is contemplated as taking residents of the western part of the county to the eastern part where much of the employment and commercial activity is concentrated. Cobb County's Brief In Support of Its Motion for Summary Judgment at 18. In addition, while describing the logical termini of Phase IV, Cobb County further augmented its claim of independent utility:

> [T]he western terminus of the East–West Connector Phase IV is the intersection of Hicks Road and the already-completed East–West Connector Phase III. This connection allows for continuity in serving east-west traffic flow in south-central Cobb County. The eastern terminus of the East–West Connector Phase IV is South Cobb Drive, a primarily north-south oriented route. South Cobb Drive is a major arterial street in the County's existing road system which carries 30–40,000 vehicles per day. There are numerous employment, commercial, retail, and recreational attractions along South Cobb Drive and it also provides a connection with other primary routes as well as the nearby interchange with Interstate 285.

AR, Volume XII at 9 ¶ (b). The County also indicated that the placement of Phase IV would be fully operational, even if no other roads were ever built to tie it into a larger network of roads in the county. The Corps was provided with minutes from multiple County Commission meetings over a 30 year period, which place the project in its proper context. AR, Volume XII at Exhibits A–AM. After reviewing the county's responses to the NEPA questions, the Corps' case document and EA found as follows:

> Construction of the East–West Connector Phase IV will complete the needed east-west arterial corridor through south-central Cobb County, one that does not now exist, that will accommodate increasing traffic from primarily residential West and Southwest Cobb County to employment and commercial attractions in the County's

Regional Activity Center concentrated around the I–75/I–[285] interchange in east-central Cobb County. Further extensions to the west or east may enhance the benefits provided by this project, *but Cobb County's traffic forecasting analyses indicate that they are not needed in order for the East–West Connector Phase IV to handle significant volumes* of trips through South Cobb County between the primarily residential west and the primarily employment and commercial east. Therefore, the East–West connector has *independent utility.*

AR, Volume XI at Exhibit 98, Part D (emphasis added). Although the final sentence of the paragraph reproduced above does not specifically reference Phase IV, it is evident from the context of the paragraph as a whole that Phase IV is the subject of the conclusion, not, as plaintiffs argue, the entire East–West Connector.

Based on its collective evaluation of this information (expanded with considerably greater detail in the AR), the Corps concluded that Phase IV enjoyed an independent utility, and thus the consideration of the impacts on the human environment of Phase IV alone would not constitute an unlawful segmentation. Plaintiffs expend a fair amount of effort contending that this conclusion is ill conceived. That notwithstanding, plaintiffs neglect to point to any factor or combination of factors which show that this decision was arbitrary, capricious or clearly erroneous. Obviously, plaintiffs take great exception with the Corps' conclusion, and the court's ruling should not be read as an indicia of approval of the final result. Rather, the court finds that the Corps has acted within the boundaries of the governing law in performing the functions delegated to it by Con-

gress and the regulatory framework under which it operates. The mere fact that Phase IV forms a logical connection with existing highways is not dispositive as to the issue of segmentation. "Because all local projects must start and end somewhere," one could theoretically argue that "the entire highway network across the country could be considered one project. Such an implication is obviously indefensible." *Village of Los Ranchos de Albuquerque v. Barnhart,* 906 F.2d 1477, 1483–84 (10th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991). Though this example is hyperbolic in comparison with plaintiffs' actual arguments, it does serve to illustrate an important point. The Corps is highly unlikely ever to be called on to evaluate a proposed road that does not serve to connect two defined points. Thus, the task before the Corps is to examine the entire context of the development to ensure that the applicants are not endeavoring to present the project piecemeal so as to avoid the proscriptions of federal law. In the absence of such a finding, the Corps enjoys tremendous leeway in evaluating whether a project can validly be construed as an independent segment. Segmentation is not unlawful per se; segmentation is only "suspect" if a project fails to meet the criteria set forth above. *Save Barton Creek Ass'n. v. Federal Highway Admin.,* 950 F.2d 1129, 1140 (5th Cir.1990), *reh'g. denied,* 957 F.2d 869 (5th Cir.), *cert. denied,* 505 U.S. 1220, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992).[5]

After reviewing the administrative record with the assistance of the parties' briefs, the court is confident in concluding that the Corps' decision to issue a FONSI based on an EA was sufficient. Stated somewhat differently, there is a reasonable basis within

---

**5.** Plaintiffs rely in part on two prior decisions of this court in arguing that the Phase IV project involved unlawful segmentation. Plaintiffs' reliance, however, is misplaced. The first case, *Inman Park Restoration, Inc. v. Urban Mass Transportation Admin.,* 414 F.Supp. 99 (N.D.Ga.1975), *aff'd.,* 576 F.2d 573 (5th Cir.1978), is distinguishable on its facts. The *Inman Park* case involved the construction of a mass transit rail system in the City of Atlanta. The court found that the preparation of a distinct EIS for individual stations would not be acceptable. The degree of interdependence among stations of a rapid rail

system is far greater than that present in developing of a series of county roads, albeit ones which may ultimately all connect to each other. Likewise, the second case, *Hawthorn Environmental Preservation Assoc. v. Coleman,* 417 F.Supp. 1091 (N.D.Ga.1976), *aff'd. per curiam,* 551 F.2d 1055 (5th Cir.1977), involved a two phase construction project in which the evidence clearly showed that one phase would not be built without the other. The evidence in the AR in the case *sub judice* suggests the contrary, particularly in light of the fact that Phases I–III have operated without Phase IV to date.

the record upon which the Corps, within its discretion, could conclude that the preparation of an EIS was not mandated, inasmuch as the construction of Phase IV of the East–West Connector does not constitute a major federal action with a significant impact on the human environment. Such a conclusion, based on the foregoing analysis, is in compliance with NEPA, 42 U.S.C. § 4332(2)(C), and the regulations promulgated pursuant to that statute. Thus, the Corps was empowered to issue a permit pursuant to § 404 of the Clean Water Act, 33 U.S.C. § 1344. "The NEPA process involves an almost endless series of judgment calls. . . . It is of course always possible to explore a subject more deeply and to discuss it more thoroughly. The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts. The latters' 'role . . . is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.' " *Coalition on Sensible Transportation, supra,* at 66 (citations omitted) (alteration in the original). This role compels the court to allow the Corps' decision to stand as rendered.

## IV. *Endangered Species Act Issue*

Plaintiffs also maintain that the issuance of the § 404 permit violates the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.* Specifically, plaintiffs claim that defendants did not engage in proper consultation regarding the impact of the project on endangered species.

 This claim can be disposed of in short order. If a proposed action is thought to have a potential effect on a federally protected endangered species, a formal consultation with the United States Fish and Wildlife Service or the National Marine Fisheries Service must be commenced. 50 C.F.R. § 402.14(a). However, if the agency determines that there is not likely to be such an effect, no consultation is needed. *Id.* An informal process of consultation is available to assist the agency in making its determination. 50 C.F.R. §§ 402.02, 402.13. The administrative record in this case provides ample evidence that an informal consultation procedure did in fact occur. AR, Volume IV at Exhibit 47. Initial and follow-up surveys indicated that no federally protected endangered species exited in the project area. AR, Volume XII at Exhibit BB; AR, Volume XI at Exhibit 98. Therefore, the Corps acted in accordance with law in finding that the project would not affect federally protected endangered species. The Corps engaged in the requisite consultations, and thereafter reasonably concluded that the commencement of the project would not be the catalyst to an ESA violation.

## V. *Miscellaneous Issues Concerning the Record and Public Hearings*

Plaintiffs have raised a few other issues which merit consideration. The first of these concerns the contents of the administrative record. Plaintiffs argue that the record before the court, on which defendants' motions are based, is deficient in that it was, at least in part, compiled after the § 404 permit was issued.[6] The defendants also take issue with the fact that the record submitted to the court is considerably more detailed than that initially given to plaintiffs at the outset of this litigation.

The latter of these points can be disposed of with relative ease. The documents which plaintiffs consider to be the "first" AR, were in fact files provided by the Corps to the Assistant U.S. Attorney for use in preparing for a hearing on a motion for a temporary restraining order. The federal defendants allowed plaintiffs to have a copy of these files. These files were never submitted to the court, and thus no intent to present them as a complete administrative record was ever manifested. In terms of the record before the court, the federal defendants maintain:

The administrative record (AR) was compiled over the next few months [after the

---

6. Defendants have submitted a certification from defendant Ogden indicating that the administrative record filed with the court is a "true and accurate" record from the Corps, relating to Phase IV of the East–West Connector. AR, Volume I. Plaintiffs accurately note, however, that this certification does not indicate the chronology of the record's compilation as compared with the date the § 404 permit was issued.

TRO hearing] from files in the possession of all Corps employees who had worked on this project, both in the Atlanta and Savannah offices. The files were organized by subject matter, reproduced, indexed, and placed in binders. The Chief of the Regulatory Branch then reviewed the files and certified that this record contained all the files pertaining to this project to the best of his information and belief.

Federal Defendants' Responsive Memorandum to Plaintiffs' Motion for Summary Judgment at 2–3. Stated succinctly, the court is quite satisfied with this explanation.

■■■ Plaintiffs also maintain that because part of the AR was apparently put together after the issuance of the § 404 permit, it is facially deficient. Specifically, plaintiffs argue that reliance on such a record contravenes the Supreme Court's instruction that review "is to be based upon the administrative record that was before the Secretary *at the time he made his decision.*" *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971) (emphasis added). As an isolated statement of law, plaintiffs position is irrefutable. That said, plaintiffs appear to read more into the defendants' explanation than is warranted by the record before the court. In the period following the TRO hearing before this court, the federal defendants, as set forth in the statement reproduced above, had all relevant Corps employees compile the AR in the form in which it is presently constituted. To that extent, plaintiffs are technically correct in observing that the AR, in its current form, did not exist at the time of the § 404 permit decision. That notwithstanding, plaintiffs fail to offer any evidence which would allow the court to make the connection which plaintiffs suggest, i.e., that the AR is not representative of the material considered by the Corps in rendering its decision. The fact that the material throughout the decision making process may not have been neatly collated in sequential binders, as it is before the court, does not prove that any or some of the material was not considered. The compilation of the AR is analogous to the preparation of a record on appeal prepared by the district court clerk, which combines the pleadings, a transcript, and evidentiary exhibits, all drawn from different sources and at different times. Plaintiffs do not raise a genuine issue of material fact as to this question, and thus it does not prevent the court from favorably ruling on defendants' motions.

### CONCLUSION

After careful consideration of both law and fact, defendants' motions for summary judgment are hereby GRANTED.

### 5. Plaintiffs' motion to supplement the record [52–1]

Plaintiffs motion seeks to supplement the AR with various outside materials, primarily consisting of depositions, affidavits, and certain permit files. The court has been through this issue before, and will not reiterate its legal findings again in this order.

The court's order of August 24, 1995, was clear in stating that the court would not depart from the AR unless certain conditions exist.[7] Based on the foregoing analysis, the court finds, as a matter of law, that none of these conditions are present in the case *sub judice.* Therefore, plaintiffs' motion to supplement the record is hereby DENIED.

### 6–7. Defendants motions to strike

Defendants' motions to strike all extra-record material referred to by plaintiffs in the motion to supplement the record is hereby DENIED AS MOOT.

To summarize:

1. Plaintiffs' motion for reconsideration is hereby DENIED [42–1];

2. Plaintiffs' motion for summary judgment is hereby DENIED [46–1];

3. Defendant Cobb County's motion for summary judgment is hereby GRANTED [47–1];

---

**7.** *See* note 1 and accompanying text for an itemization of those conditions which warrant departure from the AR.

4. Federal defendants' motion for summary judgment is hereby GRANTED [50–1];

5. Plaintiffs' motion to supplement the record is hereby DENIED [52–1];

6. Defendant Cobb County's motion to strike is hereby DENIED AS MOOT [56–1]; and,

7. Federal defendants' motion to strike is hereby DENIED AS MOOT [57–1].

IT IS SO ORDERED.